**2024-1396**

# United States Court of Appeals for the Federal Circuit

US INVENTOR, INC., NATIONAL SMALL BUSINESS UNITED,

*Plaintiffs-Appellants,*

– v. –

UNITED STATES PATENT AND TRADEMARK OFFICE, KATHERINE K. VIDAL, Under Secretary of Commerce for Intellectual Property and Director of the United States Patent and Trademark Office,

*Defendants-Appellees.*

*On Appeal from the United States District Court for the District of Columbia, No. 1:22-cv-02218-JDB. The Honorable John D. Bates, Judge Presiding.*

## BRIEF FOR APPELLANTS

ROBERT GREENSPOON
JONATHAN HILL
DUNLAP BENNETT & LUDWIG PLLC
333 North Michigan Avenue,
  Suite 2700
Chicago, Illinois 60601
(312) 551-9500
rgreenspoon@dbllawyers.com
jhill@dbllawyers.com

*Counsel for Appellants*

MARCH 26, 2024

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF INTEREST</u>

| | |
|---|---|
| **Case Number** | 24-1396 |
| **Short Case Caption** | US Inventor, Inc. v. PTO |
| **Filing Party/Entity** | US Inventor Inc., National Small Business United |

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes.  Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 02/09/2024

Signature: /s/Robert Greenspoon

Name: Robert Greenspoon

FORM 9. Certificate of Interest

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities. ☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities. ☑ None/Not Applicable |
| US Inventor, Inc. | | |
| National Small Business United | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐    Additional pages attached

FORM 9. Certificate of Interest

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐ None/Not Applicable          ☐ Additional pages attached

| | | |
|---|---|---|
| William W. Flachsbart | | |
| Brian Medich | | |
| | | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐ Yes (file separate notice; see below)   ☑ No   ☐ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable          ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# TABLE OF CONTENTS

STATEMENT OF RELATED CASES ...................................................................1

JURISDICTIONAL STATEMENT .......................................................................1

PRELIMINARY STATEMENT...........................................................................1

STATEMENT OF ISSUES ................................................................................4

STATEMENT OF THE CASE...........................................................................5

    A.   Appellants' Petition For Rulemaking.........................................................5
    B.   USPTO's Denial Of The Petition.............................................................7
    C.   Effective Redress Does Not Require The USPTO To Adopt The Specific Provisions Proposed In Appellants' Petition. .................................................9
    D.   Injuries To Appellants' Membership .......................................................12
    E.   Proceedings In The District Court.............................................................14

SUMMARY OF THE ARGUMENT ....................................................................15

STANDARD OF REVIEW .................................................................................16

ARGUMENT ......................................................................................................17

I.    THE DISTRICT COURT ERRED IN FINDING THE RISK OF PATENT INVALIDITY TO BE THE SAME IN AIA PROCEEDINGS AS IN FEDERAL DISTRICT COURT LITIGATION...........................................17

    A.   The District Court Procedurally Erred In Failing To Credit Appellants' Well-Pleaded Allegations And Crediting Those Provided By The USPTO. ............................................................18
    B.   The District Court Substantively Erred In Crediting Patent Cancellation Rates Asserted By The USPTO. ................................20

iv

C.   The District Court's Statistical Analysis Improperly Failed To Focus On The Injury Suffered By Appellants......................................25

II.  THE DISTRICT COURT APPLIED THE WRONG STANDARD TO ASSESS INJURY.............................................................................26

III. EVEN UNDER THE DISTRICT COURT'S ERRONEOUS FOUR-PART TEST, STANDING STILL EXISTS. ..........................................................33

CONCLUSION ......................................................................35

# TABLE OF AUTHORITIES

## Cases

*Apple v. Vidal*,
 63 F.4th 1 (Fed. Cir. 2023) ................................................................. 2

*Ashcroft v. Iqbal*,
 556 U.S. 662 (2009) ......................................................................... 20

*Bioparques De Occidente, S.A. de C.V. v. United States*,
 31 F.4th 1336 (Fed. Cir. 2022) ........................................................ 19

*Boyde v. California*,
 494 U.S. 370 (1990) ......................................................................... 22

*David v. FEC*,
 554 U.S. 724 (2008) ......................................................................... 35

*Gettman v. DEA*,
 290 F.3d 430 (D.C. Cir. 2002) .................................................... 26, 27

*Humane Soc'y of the U.S. v. Vilsack*,
 797 F.3d 4 (D.C. Cir. 2015) ............................................................. 28

*Intellectual Ventures I LLC v. Erie Indem. Co.*,
 850 F.3d 1315 (Fed. Cir. 2017) ........................................................ 16

*James v. j2 Cloud Servs., LLC*,
 887 F.3d 1368 (Fed. Cir. 2018) ........................................................ 19

*Lujan v. Defenders of Wildlife*,
 504 U.S. 555 (1992) .................................................................... 17, 28

*Massachusetts v. EPA*,
 549 U.S. 497 (2007) .................................................................... 30, 32

*Microsoft Corp. v. i4i Ltd. P'ship*,
 564 U.S. 91 (2011) ...................................................................... 23, 28

*NRDC v. Wheeler*,
 955 F.3d 68 (D.C. Cir. 2020) ...................................................... 16, 19

*Spokeo, Inc. v. Robbins*,
 578 U.S. 330 (2016) ......................................................................... 27

*Susan B. Anthony List v. Driehaus*,
 573 U.S. 149 (2014) ......................................................................... 30

*TransUnion LLC v. Ramirez*,
 141 S. Ct. 2190 (2021) ..................................................................... 31

*TriVascular, Inc. v. Samuels*,
   812 F.3d 1056 (Fed. Cir. 2016) ..........................................................22
*Warth v. Seldin*,
   422 U.S. 490 (1975)..........................................................................19

## Statutes

28 U.S.C. § 1331 ....................................................................................1
35 U.S.C. § 321 ....................................................................................11
35 U.S.C. § 101 ....................................................................................24
35 U.S.C. § 102 ....................................................................................25
35 U.S.C. § 103 ....................................................................................25
35 U.S.C. § 112 ....................................................................................24
35 U.S.C. § 311 ....................................................................................25
35 U.S.C. § 314 ...............................................................................11, 21
35 U.S.C. § 316 ......................................................................................5
35 U.S.C. § 324 ....................................................................................11
35 U.S.C. § 326 ......................................................................................5
37 CFR § 42 ................................................................................. 5, 6, 9
5 U.S.C. §§ 701-706.............................................................................1

## Rules

Federal Rule of Appellate Procedure 4(b) ..............................................1
Federal Rule of Civil Procedure 12(b)(1) .................................... 1, 16, 19

**STATEMENT OF RELATED CASES**

Under Federal Circuit Rule 47.5, there are no related cases.

**JURISDICTIONAL STATEMENT**

On July 27, 2022, Appellants filed a Complaint with the United States District Court for the District of Columbia, seeking relief under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706, and invoking federal question jurisdiction under 28 U.S.C. § 1331. (Appx26.) On July 12, 2023, the District Court granted a motion under Federal Rule of Civil Procedure 12(b)(1) to dismiss Appellants' Complaint for lack of standing. (Appx2-20.) The dismissal constituted a final decision, disposing of all claims in Appellants' Complaint.

In accordance with Federal Rule of Appellate Procedure 4(b) (*i.e.*, Appellee being a United States agency), on September 8, 2023, Appellants timely filed a notice of appeal to the United States Court of Appeals for the District of Columbia Circuit. (Appx255.) On January 23, 2024, the United States Court of Appeals for the District of Columbia Circuit ordered the appeal transferred to this Court. (*See* Appx25.) The appellate jurisdiction of this Court is invoked under 28 U.S.C. § 1295(a)(1).

**PRELIMINARY STATEMENT**

Common sense alone, combined with the experience of every Circuit Judge on this Court, elevates to non-speculative *fact* that accused infringers prefer, and

1

patentees revile, post-grant patent challenges within the United States Patent & Trademark Office ("USPTO"). Some accused infringers have financed expensive litigation to curtail the current limited administrative authority of the USPTO to reject their challenges. *E.g., Apple v. Vidal*, 63 F.4th 1, 15-17 (Fed. Cir. 2023), *cert denied*, 144 S. Ct. 548 (Jan. 8, 2024) (concluding Apple has Article III standing to challenge *Fintiv* standards for lacking notice and comment rulemaking, even though direct "contrary to law" challenge held unreviewable). This case presents the other side of the *Apple v. Vidal* coin: inventor groups seeking to expand administrative authority to jettison post-grant patent review. If Apple in *Apple v. Vidal* had standing to invoke legal processes to push for administrative agency rulemaking that would hurt inventors, it is only sensible that Appellants here had standing to invoke complementary legal processes to guide agency rulemaking to help inventors.

Apple had Article III standing even though its agency-rulemaking gripes were indirect (seeking judicial review of the mere absence of prior rulemaking). Appellants' efforts by contrast are direct—going through the "front door" to effect positive change. Here, Appellants filed a rulemaking petition under the Administrative Procedure Act ("APA") aimed at rationalizing the manner in which the USPTO institutes proceedings to cancel patent claims. The Patent Trial and Appeal Board ("PTAB") conducts such proceedings under the American Invents Act ("AIA") in response to petitions, usually from accused infringers (hereafter,

"infringer petitions"). Such infringer petitions result in a high rate of administrative agency patent claim cancellation.

Appellants sought rulemaking under the APA to bring AIA challenges in line with Congressional intent, by providing an exemption for small business owners of patents. The USPTO improperly denied that rulemaking petition, in violation of the APA. Thereafter on judicial review authorized by the APA, a federal district court denied Appellants their day in court, purportedly because they lack the "injury" necessary for standing under Article III of the Constitution. This constituted reversible error.

The district court misapplied the principles governing the "injury" requirement under the rules of Article III standing. *First*, it improperly required proof (as opposed to accepting as true Appellants' well-pleaded allegations) that the risk of patent invalidation in AIA proceedings is higher than in federal district court litigation.[1] And even then, the district court clearly erred in accepting the USPTO's statistical arguments without critical analysis of underlying data showing that indeed PTAB patent invalidation rates far exceed that of district courts. *Second*, the district

---

[1] Appellants use the term "invalid" or "invalidation" as convenient shorthand to describe most AIA trial outcomes, because that is what lay people perceive has happened. Legally and technically, though, what actually occurs is different—a final written decision finding "unpatentable" certain claims, followed by the USPTO Director's ministerial act of entering "cancellation" into a patent's record via a certificate to that effect.

3

court applied a byzantine and overly burdensome test for "injury," ignoring that injury need only be "particularized" and "concrete"—including reputational harm—as Appellants properly alleged in the Complaint. *Third*, even under the district court's incorrect articulation of the injury test for standing purposes, it failed to recognize a clear example of an Appellant member that satisfied that onerously-and-erroneously heightened test, sufficient to satisfy "associational standing" applicable to membership organizations. This Court should reverse.

## STATEMENT OF ISSUES

1.     Whether the district court erred in failing to credit Appellants' well-pleaded allegations that the risk of patent invalidity is higher during AIA proceedings, as compared with proceedings before a federal district court.

2.     Whether the district court erred in uncritically accepting the USPTO's statistics that the risk of patent invalidity is the same during AIA proceedings, as compared with proceedings before a federal district court.

3.     Whether the district court erred in failing to consider that the class of Appellants' members constituting small-business patent owners would be exempt from involuntary AIA review under the proposed regulations.

4.     Whether the district court erred in applying a test for Article III standing that required "injury" beyond that which is "particularized" and "concrete."

5.     Whether the district court erred in determining that one of US Inventor's members (*i.e.*, 10Tales) failed to qualify for its erroneous four-part test for "injury" under its improper view of Article III standing requirements.

## STATEMENT OF THE CASE

Congress *mandated* that the USPTO Director "*shall* prescribe *regulations* … setting forth the standards for the showing of sufficient grounds *to institute* a review" and for "*establishing* and governing [a] review under this chapter and the relationship of such review to other proceedings under this title." 35 U.S.C. §§ 316(a) and 326(a) (emphasis added). The statute also requires that in promulgating these regulations, "the Director *shall* consider the effect of any such regulations on the economy, the integrity of the patent system, the efficient administration of the Office, and the ability of the Office to timely complete proceedings." 35 U.S.C. §§ 316(b), 326(b) (emphasis added). However, the USPTO failed to perform its nondiscretionary duty of considering these four statutory factors and issuing regulations governing the decisions on institution of AIA trials. (Appx36-40 (Complaint), ¶¶ 30-36).)

### A.     Appellants' Petition For Rulemaking

Every citizen has a right to petition an administrative agency to conduct rulemaking. Exercising this right, Appellants filed a joint Petition for Rulemaking to propose rule-based protection from AIA trials for small entities, in the following:

5

1.     An amendment to 37 CFR § 42.108 for *Inter Partes* Review by adding:

(d)     Notwithstanding subsection (c) in partes review shall not be instituted <u>if the patent owner objects</u> and:

    (1)     the same of substantially the same prior art or arguments previously were presented to the Office, unless the petitioner has demonstrated that the Office clearly erred in a manner material to the patentability of challenged claims;

    (2)     another *inter partes* review or post-grant review of any of the challenged claims has been instituted;

    (3)     any of the challenged claims are also challenged in another petition by the petitioner, the petitioner's real party-in-interest, or a privy of the petitioner;

    (4)     any of the challenged claims are concurrently asserted against the petitioner, the petitioner's real party-in-interest, or a privy of the petitioner in a district court action and the court has not issued any order that is contingent on institution of review; or

    (5)     <u>the patent owner –</u>

        (A)     <u>was the applicant to whom the patent was originally issued;</u>

        (B)     <u>claimed small entity or micro entity status at the time the patent was issued; and</u>

        (C)     <u>actually reduced one or more of the challenged claims to practice.</u>

(Appx60-61 (Petition at 12-13) (emphasis added).)

2.     An amendment to 37 CFR § 42.208 for Post Grant Review by adding:

(d)     Notwithstanding subsection (c) in partes review shall not be instituted <u>if the patent owner objects</u> and:

    (1)     the same of substantially the same prior art or arguments previously were presented to the Office, unless the petitioner has demonstrated that the Office clearly erred in a manner material to the patentability of challenged claims;

    (2)     another *inter partes* review or post-grant review of any of the challenged claims has been instituted;

> (3)     any of the challenged claims are also challenged in another petition by the petitioner, the petitioner's real party-in-interest, or a privy of the petitioner;
> (4)     any of the challenged claims are concurrently asserted against the petitioner, the petitioner's real party-in-interest, or a privy of the petitioner in a district court action and the court has not issued any order that is contingent on institution of review; or
> (5)     the patent owner –
>> (A)     was the applicant to whom the patent was originally issued;
>> (B)     claimed small entity or micro entity status at the time the patent was issued; and
>> (C)     actually reduced one or more of the challenged claims to practice.

(Appx61-62 (emphasis added).) Appellants further stated that "[t]hese rule changes will improve the reliability of the patent grant and better align procedures for AIA trials with the Constitution and Congressional intent…." (Appx62.)

As pleaded, "absent such rule-based 'veto' power, [small business patent owners] face an increased risk of patent cancellation under PTAB procedures biased against patent owners, compared with [] federal district court proceedings…." (Appx27 (Complaint), ¶5).)

## B.     USPTO's Denial Of The Petition

The USPTO's three-page denial of Appellants' Petition contained little explanation as to the denial of the rule-based protection for small entities. (*See* Appx70-72 (Denial at 1-3).) In denying Appellants' proposed rule, the USPTO:

1.     Briefly summarized portions of the Petition in general terms:

7

> The Petition requests that the Office's rules on institution of AIA trials be amended to add a new subsection (d) that would set forth specific circumstance where the Office will, as a matter of discretion, not institute an inter partes review or post-grant review. Petition 12-14. According to the Petition, the proposed rules "are intended to make institution less common." *Id*. at 15.

(Appx71.)

> 2.    Briefly mentioned that the USPTO had issued a Request for Comments in general term, albeit *after* the Petition's initial filing:

> The Office, in principle, supports the goal of providing clarity as to the institution standards for AIA trials. Towards this end, the Office issued a Request for Comments, to obtain feedback from stakeholders not to institute an AIA trial proceeding. Request for Comments on Discretion to Institute Trials Before the Patent Trial and Appeal Board, 85 FR 66502 (Oct. 20, 2020) ("RFC").

> The Office received 822 comments from a wide range of stakeholders, including individuals, associations, law firms, companies, and three United States Senators.

(Appx71-72.)

> 3.    Denied the Petition in unspecified terms without proper explanation, while failing to complete a disposition of the issue:

> The issues raised in the Petition overlap those raised in the RFC. The Office is currently reviewing the extensive stakeholder commentary that it received in response to the RFC.

> Accordingly, the Office <u>denies</u> the Petition, with the understanding that suggestions provided in the Petition will be considered as part of any future rulemaking on AIA trials.

(Appx72 (emphasis original).)

8

### C.     Effective Redress Does Not Require The USPTO To Adopt The Specific Provisions Proposed In Appellants' Petition.

The USPTO's grant of the Petition for rulemaking would not have required the agency to promulgate the specific suggested text in Appellants' proposed rule. Rather, the USPTO had discretion after granting the Petition and commencing the rulemaking to arrive at rules based on public comments from all stakeholders and the USPTO's reasoned considerations. (Appx63-64.) The resultant rules, however, are likely to be more favorable in protecting Appellants' members from being hauled involuntarily into AIA trials. (Appx63.)

For example, if only one provision in Appellants' proposal were adopted, *e.g.*, Subsections (d)(5)(B) of proposed 37 CFR §§ 42.108, and 42.208, all practicing micro and small entity patent owners would be protected from AIA trial institutions via a "veto" power, which would be applicable to virtually all of Appellant Associations' members. Moreover, substantial evidence supported Appellants' proposition that a rulemaking proceeding would result in rule-based protection from AIA trials. Independent of the Petition, numerous public comments collected by the USPTO on that very issue confirmed this to be so,[2] which comments advocate

---

[2] Comments on Discretion to Institute Trials Before the Patent Trial and Appeal Board published October 20, 2020, at https://www.uspto.gov/patents/ptab/comments-proposed-rules-discretion (Hereinafter "Comments Webpage"). It is undisputed that these comment collection activities were not in themselves part of any notice-and-comment rulemaking.

9

specific protections from institution of AIA trials under certain circumstance. Those commenters are stakeholders who would likely participate in the rulemaking proceeding initiated upon the grant of Appellants' Petition. Relevant comments on the Comments Webpage can be categorized under the four mandatory statutory factors as follows:

(a)    Under the "effect on the economy" factor, several commentators advocate denial of institution of AIA trials based on the economic status of the parties;[3]

(b)    similarly, several comments advocate denial of institution under the "integrity of the patent system" factor;[4]

---

[3] *See* Comments Webpage, Comments of IEEE-USA, at 8-9 (Recommending (a) denial of institution whenever there is a disparity in the parties' economic status under the USPTO entity size rules; (b) denial of institution upon a patent owner demonstration of economic hardship); Comments of the Inventors Association of Arizona, at 2 ("Regulations should account for the proportionally greater harms to independent inventors and small business posed by institution of an AIA trial … including their financial resources and access to effective legal representation."); Comments of Cellspin Soft Inc., at 3 (same); Comments of Inventing with Adrian, LLC, at 3 (same); Comments of MadStad Engineering, at 2-3 (same); Comments of Tampa Bay Inventors Council, at 2 (same); Comments of Zond LLC, at 2 (same); Comments of Zugara, Inc. at 2 (same); Comments of Berkshire Innovations, Inc., at 2 (same); Comments of Blue Calypso Inc., at 2 (same); Comments of Small Business Technology Council, at 4 (similar).

[4] *See* Comments Webpage, Comments of IEEE-USA, at 9 (Recommending rules denying institution of IPRs for post-AIA patents when petitioner fails to satisfactorily explain why it did not file a timely PGR challenge, explaining that those "who wish to challenge post-AIA-issued patents can do so within 9 months of issuance in PGR proceedings using *all* invalidity grounds. 35 U.S.C. § 321(c). The law favors certainty, and patent public policy favors quiet title. Accordingly, the PTO regulations should require the petitioner to explain why their delay in challenging a post-AIA patent was reasonable."); Comments of AUTM, at 3 ("AUTM support a bright-line rule that precludes institution of an AIA trial against challenged claims if

(c)    other comments suggest denial of institution under the "efficient administration of the Office" factor;[5] and

(d)    still others recommend rules for denying institution apparently under "the ability of the Office to timely complete proceedings" factor.[6]

---

the patent owner opposed institution and any of the challenged claims are or have been asserted against [the patent challenger] in another proceeding such as in a district court or ITC action that is unlikely to be stayed."); Comments of the Innovation Alliance, at 5 (Suggesting that new rules related to discretionary institution include: (1) [standing] consideration of whether a petitioner is an accused infringer of the challenged patent, and (2) a requirement that petitioners who are not accused infringers submit a certification and explanation of their relationship to the patent owner, if any, and why they are seeking cancellation of the patent owner's claims.); Comments of Inventors Network, at 2 (Proposing "standing" and "Time Limits" for filing petitions to institute AIA trials.).

[5] *See* Comments Webpage, Comments of IEEE-USA, at 13 ("(a) *Deny AIA trial institution if the fraction of challenged claims and grounds for which petitioner failed to establish a reasonable likelihood of success is large.* The regulation should provide a standard for determining the tolerable limit on such large fraction based on projected resource wasted on adjudicating that large fraction of claims and grounds on which petitioner is unlikely to prevail. This will remove uncertainty and provide consistent application of this measure to ensure 'efficient administration of the Office.' (b) *Deny AIA trial institution by instituting Director-initiated ex-parte reexamination at the request of the patent owner*. When a petitioner challenge of a patent meets the threshold for institution under 35 U.S.C. §§ 314(a) or 324(a), and the patent has complexity and claim count that warrant material amendments to the claims, the Director should order ex-parte reexamination under 35 U.S.C. § 303(a) at the request of the patent owner. The patent owner's request should be included in its preliminary response, identifying the claims and proposed amendments thereto. Allowing the patent owner the iterative procedure of reexamination will increase fairness and will enhance the 'efficient administration of the Office.'").

[6] *See* Comments Webpage, Comments of the Alliance for U.S. Startups and Inventors for Jobs, at 6 ("petitioners do not have an indisputable 'right' to a favorable institution decision, and there is nothing unjust in leaving challengers to raise validity arguments in the district court or ITC where doing so is essential to preserve fundamental fairness to the patent owner.").

### D.    Injuries To Appellants' Membership

Appellants are US Inventor, Inc. ("US Inventor") and National Small Business United ("NSBU"). (Appx27-28.) US Inventor "fosters innovation through advocacy, education, and public outreach on matters of importance to individual inventors and small innovative businesses." (Appx27.) Its "membership includes small business and individual patent owners who were, are and will be respondents to" AIA proceedings before the PTAB. (Appx27) NSBU is a nonprofit corporation that has, for over eighty years, represented the small business community before the U.S. Congress, the White House, and federal agencies, advocating for the interest of their customers, their companies, and their communities to help ensure the continued viability of their small business way of life. (Appx28.)

As pleaded, both Appellants have members constantly facing new AIA challenges. (Appx27-29 (Complaint, ¶¶ 5-8).) Those members have only three months to assemble discretionary denial arguments which then are addressed within three months thereafter. They would qualify for the rule-based protection from AIA trials which would likely exist as a direct proximate result of a grant of the Petition, even if the resultant rules do not include the Petitions' specific proposed provisions. (*See* Appx30 (Complaint, ¶ 15).) Membership injury is likely to recur during any timespan when rulemaking petitions like the one here undergo and/or evade judicial review.

12

Of particular relevance here is 10Tales, a small entity, patent-owning member of US Inventor that would qualify for petitioned resultant protection from AIA trial institution. 10Tales initially presented IPR non-institution arguments within its short three-month window, naming both discretionary and merits reasons. In August 2021, it prevailed on merits reasons, but that was not the end of it. The patent challenger sought reconsideration in September 2021 that, if granted, would trigger the USPTO's duty to take up those discretionary arguments. (*See* Appx206-225.) That reconsideration request was pending at a time in which 10Tale's protection from AIA trials was nonexistent because of the rulemaking Petition Denial under challenge here. (Appx93 (July 25, 2022 Malone Decl. ("1st Malone Decl."), ¶18).) Beyond 10Tales, numerous small entity inventor members of USI would have been protected from AIA trial institution had the USPTO acted lawfully by granting the underlying Petition and promulgating responsive regulations. (Appx227-231 (Nov. 15, 2022 Malone Decl. ("2d Malone Decl."), ¶¶ 2-14).)

In short, the Complaint filed by Appellants pleaded facts that more than sufficiently support their Article III standing at the early pleading stage. (*See, e.g.*, Appx27-29, Appx43 (Complaint, ¶¶ 5-8, 45 (pleading injury to their members in the absence of a rule-based protection from institution)); Appx97-98 (1st Malone Decl., ¶27 ("The institution decision (when it occurs) increases risk of future patent invalidation-harm from 0% (if no copending procedures exist) to 84%; or

alternatively, from 29% (if judicial proceedings exist) to 84%)); Appx98 (1st Malone Decl., ¶28 (pleading harm to reputation and goodwill); Appx103 (Sherman Decl., ¶11 (corroborating reputational injury at the point of institution, regardless of the ultimate determination of patentability)); Appx104 (Sherman Decl., ¶14 ("Without that rulemaking, we cannot veto the process and might have to face an 84% invalidation rate proceeding (compared to 29% in federal court). Actually in Ecometals litigation, defendants are not even seriously pursuing invalidity as a defense, thus we have a 0% chance of invalidation there outside of IPR.").)

### E.    Proceedings In The District Court

The district court found that Appellants lacked standing to challenge in federal district court the USPTO's denial of its rulemaking petition. (Appx2.) Specifically, the district court found a lack of "injury" for Article III standing purposes, for the supposed failure of the following events to occur:

> (1) A third party will file an IPR or PGR petition for review of a specific patent held by a member of each of their organizations; (2) the IPR or PGR petition would satisfy the minimum standards for institution of such a proceeding; (3) the Board would not exercise the Director's discretionary authority to decline institution under the current guidance, but would do so under a new regulation that the USPTO would adopt if it had granted Plaintiffs' Rulemaking Petition; and (4) the institution of IPR or PGR proceedings creates a substantially higher probability of improper cancellation of the patent than adjudication of the same claims through other proceedings, such as district court litigation.

(Appx11-12.) It labeled Appellants' injury theory to be "too speculative," (Appx17), largely based on its conclusion that that the "risk of injury to plaintiffs' members [is

14

no different] in AIA trials versus federal district court proceedings." (Appx16.) It failed to credit allegations of reputational injury resulting from institution-grant decisions. (Appx16-17.) And it illogically dismissed evidence of an Appellant member (*i.e.*, 10Tales), which could have avoided a rehearing petition had the proposed rulemaking been implemented. (*See* Appx13.) These errors require reversal.

## SUMMARY OF THE ARGUMENT

In dismissing this action on standing grounds, the district court committed multiple reversible errors. The district court erroneously accepted the USPTO's argument that the injury alleged in the Appellants' well-pleaded Complaint was "too speculative" to confer Article III standing, purportedly because the injury depends on a four-part test, requiring: (1) a third party to file for AIA proceedings; (2) initial screening by the PTAB to institute an AIA trial; (3) proposed regulations would make a difference regarding the decision whether to institute an AIA trial; and (4) if instituted, the AIA proceedings would result in higher likelihood of patent claim cancellation that would occur in other proceedings, such as district court litigation. (Appx11-17.) *First*, the district court erroneously failed to accept Appellants' well pleaded facts that the risk of patent claim cancellation is higher at the PTAB than in federal district court. *Second*, the district court mistakenly applied the wrong standard for evaluating standing. *Third*, even under the district court's improper

15

formulation of the test for standing, it ignored facts establishing the existence of standing. As explained further below, this Court should reverse the district court's decision.

## STANDARD OF REVIEW

This Court reviews *de novo* a Rule 12(b)(1) dismissal for lack of standing. *Intellectual Ventures I LLC v. Erie Indem. Co.*, 850 F.3d 1315, 1320 (Fed. Cir. 2017). In a case seeking review of an agency's rulemaking related activities, when assessing whether there is "concrete injury" among the plaintiffs, a district court is required to assume that the plaintiffs win on the merits. *NRDC v. Wheeler*, 955 F.3d 68, 77 (D.C. Cir. 2020) ("[F]or purposes of determining standing, we must assume that petitioners will prevail on the merits of their argument."). Put differently, the district court was required to assume for purposes of the standing analysis that by the Director acting unlawfully to evade notice-and-comment rulemaking on discretionary standards for the institution of trial, a citizen's petition demanding that to start must be granted. *Id.* Likewise, the district court was required to assume the truth of the Complaint's allegations related to concrete injury. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) (holding that at the pleading stage, "general factual allegations of injury resulting from the defendant's conduct may suffice").

16

# ARGUMENT

## I.    THE DISTRICT COURT ERRED IN FINDING THE RISK OF PATENT INVALIDITY TO BE THE SAME IN AIA PROCEEDINGS AS IN FEDERAL DISTRICT COURT LITIGATION.

Central to this case, as well as the impetus for Appellants' Petition for Rulemaking, is that AIA proceedings result in findings of patent claim invalidity with an alarmingly greater frequency than in federal district court. The Petition for Rulemaking took no issue with either institution's decisional accuracy, institutional bias, or institutional competency. The Petition for Rulemaking simply relied on that plain pleaded fact, without any challenge to or criticism of the reasons why this has historically happened. In other words, APA rulemaking-petition proceedings at the agency were, and this subsequent judicial review is, agnostic and free of any moral or value judgments. Appellants just want to solve a societal problem with the tools provided by Congress under the law – a citizen's rulemaking petition.

Applying the erroneous "step four of the injury chain" proposed by the USPTO, the district court found that "plaintiffs must show a high likelihood that patents would be cancelled through AIA trials (once instituted) that otherwise would not be with the proposed rule change." (Appx15.) The district court dismissed Appellants' assertion of harm and well pleaded allegations of statistical risk, finding that "there is no compelling reason to conclude the chances of cancellation are any

17

different in AIA trials versus federal district court proceedings." (Appx16.) In so doing, it rejected Appellants' allegations—and evidence—that the PTAB invalidates (in whole or in part) patents 84% of the time in AIA proceedings that reach a final judgment, as opposed to about a 29% invalidity rate before federal district courts. (Appx15-16.) The district court instead credited the USPTO's assertion that, during the 2021 fiscal year, the PTAB invalidated (in whole or in part) only 21% of patents. (Appx15-16). The district court thus took the USPTO's bait to invoke a comparison of outcomes between fora that was not apples-to-apples, not even apples-to-oranges, but much closer to apples-to-monkeys. This determination was wrong, procedurally and substantively, and also was irrelevant to the standing issue here.

     **A.**     **The District Court Procedurally Erred In Failing To Credit Appellants' Well-Pleaded Allegations And Crediting Those Provided By The USPTO.**

Procedurally, the district court erred in rejecting Appellants' allegations and accepting the USPTO's contrary arguments. "For purposes of ruling on a motion to dismiss for want of standing, both the trial and reviewing courts must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." *Warth v. Seldin*, 422 U.S. 490, 501 (1975) (*quoted in James v. j2 Cloud Servs., LLC*, 887 F.3d 1368, 1372 (Fed. Cir. 2018)); *accord Bioparques De Occidente, S.A. de C.V. v. United States*, 31 F.4th 1336, 1343 (Fed. Cir. 2022) (addressing a Rule 12(b)(1) motion to dismiss and stating that "we must

accept well-pleaded factual allegations as true and must draw all reasonable inferences in favor of the claimant.").[7]

Here, Appellants pleaded in their Complaint that "[a]bsent [the proposed] rule-based 'veto' power, member-respondents face an increased risk of patent cancellation under PTAB procedures biased against patent owners, compared with … federal district court invalidity proceedings … and that there is an 84% chance that the PTAB will find a claim or claims of such member-respondents' unpatentable…." (Appx27 (Complaint, ¶6).) This should alone have sufficed to establish standing. *Wheeler*, 955 F.3d at 77 (increased risk to property absent particular agency regulations suffices under Article III). In further support, attached to the Complaint, was a declaration setting forth the results of a study showing that patent invalidity findings in federal district court occur only about 29% of the time. (Appx90-91 (1st Malone Decl. at ¶11).) "When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). The district court found nothing "implausible" about Appellants' allegations. Instead, it improperly considered—and credited—the USPTO's contrary statistical

---

[7] The parties and the district court recognized that Appellants are permitted to invoke the interests of their membership to prove "associational standing." There is no dispute that this case qualifies for such associational standing analysis, with focus on the "injury" suffered by membership.

argument. The law forbids such factual dispute resolutions at this stage of litigation. There was nothing implausible about the allegation that "member-respondents face an increased risk of patent cancellation under PTAB procedures … compared with … federal district court invalidity proceedings," and, as such, the allegation should have been accepted as true, regardless of contrary arguments submitted by the USPTO.[8]

### B.    The District Court Substantively Erred In Crediting Patent Cancellation Rates Asserted By The USPTO.

A regulation exempting small business patent owners from AIA trials via voluntary opt-outs undeniably would prevent patent claim cancellation in AIA proceedings for that particular class of patentees. But the district court's decision to credit—without any serious scrutiny—the USPTO's statistical arguments constituted error, in multiple ways. No sound basis exists for the conclusion that district court litigation results in invalidity determinations at a rate equivalent to that of AIA proceedings.

---

[8] One distinguished law firm uninvolved in this case has published statistics that are entirely consistent with the pleading allegations: https://www.finnegan.com/en/at-the-ptab-blog/claim-and-case-disposition.html (last viewed March 21, 2024, reporting on statistics "as of January 31, 2024") ("IPR, CBM, and PGR Combined Results by Claim" – 73.56% "Instituted Claim Canceled by PTAB," 24.12% "instituted Claim Survived" and 2.31% "instituted Claim Conceded by Owner"). Appellants disclosed their calculation methodology and use of the Docket Navigator database to collect data at https://usinventor.org/assessing-ptab-invalidity-rates/ (84% of patents reaching final written decision partially or wholly invalidated).

*First*, the district court assumed the wrong standard for AIA trial institution and ignored the USPTO's own statistics. In the proceedings below, there was no dispute that, post-institution, the PTAB invalidates (in whole or in part) patents 84% of the time or that federal district courts do so (in equivalently-final judgments) only about 29% of the time. (*See* Appx248-249 (USPTO Reply Br.); Appx15.) The district court found those statistics "shocking" until it purportedly "realize[d] that PTAB proceedings are only authorized if the USPTO believes there is a *high* likelihood of invalidity." (Appx15 (emphasis added).) In so doing, the district court grossly—and erroneously—amplified the USPTO's argument that the PTAB "do[es] *some* merits-related screening before instituting a proceeding." (Appx248 (emphasis added).)

But the PTAB's gatekeeping function is nowhere near that rigorous. Under 35 U.S.C. § 314(a), the threshold issue for an AIA trial merely requires a finding that there is a "*reasonable* likelihood that the petitioner would prevail with respect to at least *1 of the claims* challenged in the petition." (Emphasis added). The "reasonable likelihood" standard presents a lower burden than the preponderance (*i.e.*, "more likely than not") standard. *See, e.g.*, *Boyde v. California*, 494 U.S. 370, 380 (1990).

And it does not cherry-pick to focus on PTAB post-institution outcomes that yield the 84% result. Just as some filtering happens at the PTAB via the "reasonable likelihood" screen at the institution stage, some filtering will have already happened

21

in district court cases at the pre-trial stage. Thus, baked into the district court 29% statistic, before a district court case has gone to final judgment, patent challengers will have already self-censored to limit their validity challenges to those they know to be "reasonably likely" to be accepted by the judge or jury. Crucially, the 29% includes only outcomes with full determinations on the validity question (akin to a PTAB final written decision), leaving out cases where validity was never challenged or all validity challenges were withdrawn. (Appx91.) This is one reason why Appellants' 84/29 comparison is apples-to-apples, but the district court's 21/29 comparison is apples-to-monkeys.

As noted by this Court, "there is a significant difference between a petitioner's burden to establish a 'reasonable likelihood of success' at institution, and actually proving invalidity by a preponderance of the evidence at trial." *TriVascular, Inc. v. Samuels*, 812 F.3d 1056, 1068 (Fed. Cir. 2016). And the institution standard is a far cry from the "clear and convincing" evidence standard employed by district courts when deciding whether to invalidate a patent claim. *See, e.g.*, *Microsoft Corp. v. i4i Ltd. P'ship*, 564 U.S. 91, 113-14 (2011). At bottom, the district court mistakenly believed in the wrong standard for AIA institution decisions ("high likelihood").

Moreover, the district court ignored the USPTO's own reported statistics showing, on a per-patent basis, that institution is denied only a meager 32% of the time.        (https://www.uspto.gov/sites/default/files/documents/ptab_aia_fy2021

22

   roundup.pdf, ("USPTO Statistics"), 12). Appellants cited the same statistic. (*See* Appx91 (noting a 68% institution rate on a per-patent basis).) Given that an undisputed 68% of challenged patents are subject to AIA trials (*i.e.*, after institution), there is no articulated dispute that 84% of those patents suffer some degree of invalidation. In other words, over 57% of patents subject to the mere *filing* of an AIA petition result in claim cancellation. That is nearly twice the 29% invalidation rate that occurs in district courts. (*See* Appx15.) The district court clearly erred in finding (without any discovery or trial proceedings whatsoever) no difference in patent invalidation rates between the PTAB and district court proceedings.

    *Second*, the USPTO's own statistics belie the district court's erroneous acceptance of the USPTO's misleading argument that only 21% of challenged patents suffer some degree of claim cancellation. (Appx15.) To begin with, in the USPTO's published "outcomes by patent" for fiscal year 2021, 23%—not 21%—of challenged patents had claims cancelled. (USPTO Statistics, 12). But that disparity proves trivial when one considers that the denominator used to calculate that cancellation rate includes AIA cases that were settled (31%), terminated by a request for adverse judgment (4%) or resulted in other means of termination not resulting in a final written decision (4%). (*Id.*) None of those circumstances involved an affirmative PTAB decision on the issue of patent claim validity. Of the 1,191 patents subject to AIA proceedings during fiscal year 2021, 379 were removed by way of

23

denial of institution and 465 of those proceedings were resolved without a final written decision on issue of validity. (*Id*.) Of the 347 patents that reached a final written decision on the merits, 269 had claims cancelled—a 78 percent rate of invalidation revealed by the USPTO's own data. (*Id*.) Viewed another way, as a result of affirmative USPTO action, only 457 of 1,191 patents challenged through an AIA petition (38%) were left unscathed, meaning that 62% of challenged patents suffered some degree of cancellation at the hands of the PTAB—according to the USPTO's own statistics. (*Id*.) Consequently, while this invalidity statistic somewhat differs from Appellants', it nonetheless confirms that the PTAB invalidity findings occur at a rate much higher than those of federal district courts (*i.e*., 29%).

*Third*, the district court ignored the reality that—not only do district courts apply a clear and convincing evidence standard for finding patent invalidity—the patent invalidation rate in district courts reflects invalidation based on issues such as 35 U.S.C. §§ 101 and 112 (written description). Those invalidity theories are unavailable in IPR proceedings (which comprise the overwhelming majority of AIA proceedings[9]). *See* 35 U.S.C. §§ 311(b). Further, even with respect to invalidity theories under 35 U.S.C. §§ 102 and 103, only patents and printed publications may be used for invalidation in IPRs. *See id*. In contrast, invalidity theories such as the

---

[9] According to USPTO statistics for its 2021 fiscal year, IPR proceedings comprised 93% of AIA proceedings. (USPTO Statistics, 3.)

"on sale" bar under 35 U.S.C. § 102(a)(1) are available in district court, but not in IPR proceedings. Accordingly, if anything, 29% at the district court is too high a comparator. The grounds for invalidating a patent in district court litigation are far more inclusive than those in AIA proceedings. Thus, the district court rate of invalidation based on the same grounds as those considered by the PTAB are clearly lower than undisputed 29% rate cited for district court invalidation in general.

In sum, even if the district court were procedurally correct in considering the USPTO's proffered statistics as contrary to those proffered by Appellants (and it was not), no legitimate basis exists (certainly not on the pleadings!) for equating the federal district court patent claim invalidation rate to that of the PTAB. This error cannot stand.

### C.    The District Court's Statistical Analysis Improperly Failed To Focus On The Injury Suffered By Appellants.

The statistical "analysis" by the district court was ultimately irrelevant. Looking at general statistics, the district court focused on the wrong issue. As discussed in further detail below, the issue for standing purposes is whether small business patent owners would have a reduced risk of patent cancellation (by any iota) had the Petition for Rulemaking been granted. If the proposed regulations were implemented, the risk of involuntary cancelation would be zero percent—an amount infinitely lower than the risk of invalidation in a federal district court. The injury to

Appellants is beyond credible dispute. Standing exists because, with proper rulemaking under the Petition, invention-practicing small business membership can and will avert AIA proceedings.

## II.     THE DISTRICT COURT APPLIED THE WRONG STANDARD TO ASSESS INJURY.

Appellants recognize that the denial of a petition for rulemaking does not *automatically* confer upon the petitioner Article III standing for challenging denial of the petition, as the USPTO argued below. (Appx117, Appx128 (citing *Gettman v. DEA*, 290 F.3d 430, 433 (D.C. Cir. 2002)).) Indeed, important separation of powers concerns, including that the right to file a petition with the Executive Branch does not, in and of itself, equate to the Article III jurisdiction of federal courts to conduct judicial review of any such petition:

> The sufficiency of the sort of "interest" allowing an interested party to petition an agency at the will of Congress and the judicially protectable "interest" required for any injury to afford standing in the courts is fundamentally the difference between the political branches on the one hand and Article III courts on the other. While it is perfectly proper … for the political branches to respond to abstract, ideological, philosophical or even idiosyncratic wishes and needs of citizens … the courts are granted authority only for the purpose delineated in Article III, section 2, clause 1 of the Constitution….

*Id*. at 433-34. But "Article III standing [does exist where] the procedures in question are designed to protect some threatened concrete interest of petitioners that is the ultimate basis of his standing." *Gettman*, 290 F.3d at 433 (cleaned up). At issue here

are property rights that are directly affected by the USPTO's refusal to properly entertain a rulemaking petition brought by organizations representing small business owners of patent property rights. Thus, this case hardly involves "abstract, ideological, philosophical or … idiosyncratic wishes." By concocting a four-part test for injury, the district court erroneously fabricated a standard far more burdensome than the law requires.

For standing purposes, the injury need only be "particularized" and "concrete." *See, e.g.*, *Spokeo, Inc. v. Robbins*, 578 U.S. 330, 339 (2016). "For an injury to be 'particularized,' it must affect the plaintiff in a personal and individual way." *Spokeo*, 578 U.S. at 339 (internal quotations omitted). "A 'concrete' injury must … actually exist." *Id*. at 340. The injury must be "real" and not "abstract," but it need not be "tangible." *Id*. "[I]ntangible injuries can … be concrete." *Id*. Moreover, the "risk of real harm" may be concrete, even where harm "may be difficult to prove or measure." *Id*. at 341. Appellants properly alleged "injury" for standing purposes.

*First*, numerous members of Appellants are small business patent owners, and a patent is statutorily deemed to have "attributes of personal property"—property that "shall be assignable in law…." *See, e.g.*, 35 U.S. § 261. The liquidity and monetization of such patent rights is obviously threatened by the relatively new AIA system of patent invalidation that was created by Congress and is administered by the USPTO. Among other things, as discussed above, the AIA system permits the

27

invalidation of patent claims under a lower standard of proof (preponderance standard) than is required by federal district courts (clear and convincing standard). *See, e.g.*, *Microsoft*, 564 U.S. at 113-14. The increased risk of invalidation undeniably affects the willingness of patent owners to assert their patents and for would-be patent assignees to acquire them. In other words, a perpetual and unmitigated cloud of uncertainty impairs the value and liquidity of patent rights. No speculation—only "common sense"—is required to see that the risk exists now and is impairing the value of patents held by small business owners. *See Humane Soc'y of the U.S. v. Vilsack*, 797 F.3d 4, 8 (D.C. Cir. 2015).

Not only are members of Appellants patent owners, most of them also are small business owners. The proposed regulations would exempt small business patent owners from involuntary AIA review. Accordingly, this is not a case of "a plaintiff raising only a generally available grievance about government—claiming only harm to his and every citizen's interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large…." *Lujan*, 504 U.S. at 573-574. Under those circumstances—inapplicable here—there is no "Article III case or controversy." *Id.* at 574. But there can be no serious dispute that small business owners of extant patents comprise a small minority of the public at large and have a concrete and particularized interest in a rulemaking process that complies with the strictures of

28

the APA. All small business patent owners are personally harmed by the USPTO's improper refusal to grant Appellants' Petition for Rulemaking to include an exemption for small business patent owners. Nothing is "generalized" about the grievance at hand. The harm here is particularized to a very specific group.

*Second*, there is nothing speculative or conjectural about the injury resulting from the improper denial of the Petition for Rulemaking. The failure to consider proposed regulations—designed to enhance the value of patents, comply with Congressional guideposts for AIA-based innovation policy, and discourage institution petitions—constitutes, in and of itself, an immediate harm to the liquidity of patents. It sends a signal that the USPTO is, with no little irony, anti-patent. Additionally, denying the Petition for Rulemaking wholly eliminates the possibility that Appellants' proposed exemption for small businesses could be adopted. In other words, there is currently a *zero percent chance* that the proposal could be adopted under the status quo, as opposed to *some possibility* (a significant one, per Appellants) that the proposed regulation would be adopted and implemented, assuming the agency acts with a rational basis.

*Third*, small business patent owner members of Appellants are injured by the status quo, *i.e.*, the tendency of the PTAB to allow AIA trials, resulting more often than not in the cancellation of patent claims. (*See* Statement of Facts, Section D.) Even if claim cancellation were not an absolute certainty under the current set of

regulations, "[a]n allegation of future injury may suffice if … there is a substantial risk' that the harm will occur." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (internal quotations omitted); *see also Massachusetts v. EPA*, 549 U.S. 497, 522-23 (2007) (accepting for purposes of standing, injury that likely will occur in the future).

To be sure, as the district court noted, AIA proceedings "start with a third party filing a petition with the USPTO." (Appx12.) It reasoned that this was a perquisite for injury. (Appx12) But such a third party logically would be less inclined to initiate AIA proceedings if there were a proposed categorical exemption (via voluntary opt-out) for small businesses. This also ignores the fact that would-be licensees or assignees of a patent are keenly aware of the PTAB's proclivity toward patent claim cancellation. In other words, if the small business exemption were on the table, such patents logically carry more value than where, as here, there is no current possibility for a small business exemption. Adoption of Appellants' proposed regulations would lift all operating small inventors' proverbial boats, all at once.

*Fourth*, beyond the increased risk of patent claim cancellation absent consideration of the proposed regulations, Appellants alleged current harm to reputation and good will. (*See* Statement of Facts, Section D.) As pleaded, that injury results from the very decision to institute. And intangible harm is recognized as

"concrete" for purposes of an Article III injury. *See, e.g.*, *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2204 (2021).

*Fifth*, the district court additionally concluded that standing is somehow lacking because "there are numerous reasons unrelated to the proposed rule changes in plaintiffs' petition why the USPTO would decline to institute AIA proceedings following submission of a petition by a third party." (Appx13.) But merely having some means under the status quo for escaping AIA trials does not mean that additional off-ramps for the patent owner (particularly for the practicing small business patent owner) would not benefit from implementation of the proposed regulations. There can be no serious question that a *per se* rule insulating small business patent owners from AIA trials materially enhances the value of their patents and insures against some risk of patent invalidation. Logic dictates that a regulation permitting small business owners to opt out of AIA proceedings removes the uncertainty attending all other avenues for statutory or discretionary denials of institution petitions. There is nothing speculative about the advantage that such a regulation would entail.

To be clear, Appellants do not ask members of this Court to endorse Appellants' preferred innovation policy. There is logical appeal to a policy preference to make it easier to "weed out bad patents." Just as much, this policy preference must occur within bounds set by Congress, including via a rulemaking

that has so far never occurred that takes into account statutory factors such as effect on the economy and integrity of the patent system. The sole question in this appeal is one of standing, not whether any Judge reading these words wants Appellants to succeed with its APA petition. As a matter of logic, common sense, evidence and well-pleaded allegations, Appellants made all sufficient pleading allegations to overcome the low bar of Article III "injury," leading inexorably to a conclusion that the district court erred to hold otherwise.

In short, Appellants had a procedural right that their rulemaking petition be properly addressed through judicial review. Were it to have been properly addressed, the district court would then undertake a merits determination to adjudge whether the denial should have been a grant, thus a remand to commence rulemaking. At that point, a distinct possibility exists that regulations would emerge to protect the narrow class of invention-practicing small business patent owners from the lopsided outcomes of AIA proceedings. The law of standing requires nothing more. *See Massachusetts v. EPA*, 549 U.S. 497, 518 (2007) ("When a litigant is vested with a procedural right, that litigant has standing if there is *some possibility* that the requested relief will prompt the injury-causing party to reconsider the decision that allegedly harmed the litigant." (emphasis added)). Appellants need not prove that its rulemaking petition would result in adoption of their proposal. Rather, "[a] litigant who alleges deprivation of a procedural protection to which he is entitled never has

32

to prove that if he had received the procedure the substantive result would have been altered. All that is necessary is to show that the procedural step was connected to the substantive result." *Id*. Appellants did so here. There was no basis to find a lack of standing.

### III.   EVEN UNDER THE DISTRICT COURT'S ERRONEOUS FOUR-PART TEST, STANDING STILL EXISTS.

The district court found that Appellants pointed to no party that could have avoided an AIA trial had their rulemaking petition been granted. (Appx13.) That is incorrect. As an initial matter, that determination overlooked the inherent cloud of uncertainty hanging over the heads of small business patent owners that would benefit from the consideration of a rule exempting them from AIA trials.

Moreover, the district court ignored the factual circumstances of 10Tales—a member of US Inventor. First, a third party filed a petition for AIA review. (Appx93-94 (1st Malone Decl.), ¶18.) Second, while the AIA petition was pending, Appellants filed their rulemaking petition. (Appx93-94, ¶¶ 18-19.) Although there is no dispute that 10Tales initially defeated an AIA petition on the patentability merits, the patent challenger sought reconsideration and 10Tales—a small entity—had to contend with this renewed threat without the benefit of regulations proposed to insulate small business from such assaults. (Appx93-94, ¶¶ 18-19.) Yet, the district court mistakenly stated that this situation "underscores why the injury … remains

33

speculative…." (Appx13.) But there can be no legitimate question that a regulation exempting practicing small business owners from AIA trials would have closed the door to any such reconsideration. The only thing speculative is whether the status quo protections also could be invoked to prevent an AIA trial. The fact that the Board might otherwise deny an AIA petition on existing grounds, (*see* Appx14), cannot alter the power, and insurance value with respect to patent property rights, of a regulation that categorically exempts practicing small business patent owners from involuntary AIA proceedings. Third, as already explained, there can be no serious question that the proposed regulations would make a difference in the outcome on reconsideration. As a small entity, 10Tales would have been *per se* exempt from unwanted AIA proceedings. Fourth, because AIA proceedings could not have been instituted against 10Tales—had the proposed regulations been adopted—there would have been zero likelihood that its patent claims would be cancelled, a risk obviously lower than the risk it would face in federal district court litigation. Accordingly, US Inventor has standing even under the district court's erroneous test for injury.

Importantly, it cannot be said that the controversy of 10Tales and others like it is somehow moot and prevents no "case or controversy" in the Article III sense. Institution decisions for AIA petitions must be made within six months of filing. The notion that rulemaking may not be possible within such a timeframe fails to insulate

the issue from review. In that regard, the Supreme Court recognizes that resolution of a grievance need not occur within any set time period where it is "capable of repetition, yet evading review." *David v. FEC*, 554 U.S. 724, 735 (2008). The USPTO cannot escape scrutiny here based on the fortuity that the rulemaking process could extend well beyond the time that an institution decision must be rendered.

## CONCLUSION

For the foregoing reasons, Appellants respectfully request that the Court reverse the district court's dismissal for lack of standing.

Respectfully submitted,

/s/ Robert Greenspoon
ROBERT GREENSPOON
JONATHAN HILL
DUNLAP BENNETT & LUDWIG PLLC
333 North Michigan Avenue,
Suite 2700
Chicago, Illinois 60601
(312) 551-9500
rgreenspoon@dbllawyers.com
jhill@dbllawyers.com

Counsel for Appellants

# ADDENDUM

**TABLE OF CONTENTS**
**ADDENDUM**

| Docket No. | Document Description | Filed | Addendum Pages |
|---|---|---|---|
| 18 | Order | 07/12/2023 | Appx1 |
| 19 | Memorandum Opinion | 04/12/2023 | Appx2 |

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **US INVENTOR, INC. et al.,**<br><br>    **Plaintiffs,**<br><br>    v.<br><br>**UNITED STATES PATENT AND**<br>**TRADEMARK OFFICE et al.,**<br><br>    **Defendants.** | **Civil Action No. 22-2218 (JDB)** |

## <u>ORDER</u>

Upon consideration of  [6] defendants' motion to dismiss, [7] defendants' motion for relief from compliance with Local Civil Rule 7(n), and the entire record herein, and for the reasons stated in the accompanying Memorandum Opinion, it is hereby

**ORDERED** that [6] the motion to dismiss is **GRANTED**; and it is further

**ORDERED** that [7] the motion for relief from compliance with Local Civil Rule 7(n) is **GRANTED**.

**SO ORDERED.**


_____/s/_____
JOHN D. BATES
United States District Judge

Dated: <u>July 12, 2023</u>

1

Appx1

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

**US INVENTOR, INC. et al.,**

     **Plaintiffs,**

     **v.**

**UNITED STATES PATENT AND**
**TRADEMARK OFFICE et al.,**

     **Defendants.**

                             **Civil Action No. 22-2218 (JDB)**

---

**MEMORANDUM OPINION**

Plaintiffs US Inventor, Inc. and National Small Business United ("NSBU") bring this action against defendants the U.S. Patent and Trademark Office ("USPTO") and Katherine Vidal, the Under Secretary of Commerce for Intellectual Property and Director of the USPTO, alleging that defendants violated the Administrative Procedure Act ("APA") by denying plaintiffs' rulemaking petition. Defendants move to dismiss the case, arguing that plaintiffs lack standing. For the reasons set forth herein, the Court concludes that plaintiffs lack standing and will accordingly grant defendants' motion to dismiss on that basis.

**Background**

In 2011, Congress passed the America Invents Act ("AIA"), which established the Patent Trial and Appeals Board ("PTAB") within the USPTO. Compl. for Decl. & Injunctive Relief [ECF No. 1] ("Compl.") ¶ 18; see 35 U.S.C. § 6. The AIA vested authority in the PTAB to conduct various proceedings by which the validity of patents may be challenged, including inter partes review ("IPR") and post-grant review ("PGR") proceedings (together, "AIA trials"). See Compl. ¶ 18; 35 U.S.C. § 6(b).

The IPR and PGR processes begin when "a person who is not the owner of a patent" files a petition with the USPTO challenging the patent and requesting that an AIA trial take place.

1

Appx2

35 U.S.C. §§ 311(a), 321(a).  When a petition is filed, the Director of the USPTO decides whether to institute an AIA trial.  Id. §§ 324(b), 314(c).  "The Director may not authorize an inter partes review to be instituted unless the Director determines that . . . there is a reasonable likelihood that the [patent challenger] would prevail with respect to at least 1 of the claims challenged in the petition."  Id. § 314(a); see also id. § 324(a) ("The Director may not authorize a post-grant review to be instituted unless . . . it is more likely than not that at least 1 of the claims challenged in the petition is unpatentable.").  No equivalent statutory mandate exists that dictates when a Director must institute a trial: even if a patent challenger makes the required showing that a patent is likely invalid, the Director may still, in her discretion, decide not to institute an AIA trial.  See Compl. ¶ 19 ("The AIA set only a one-sided (prohibitory) bound on the Director's authority . . . ."); Cuozzo Speed Techs., LLC v. Lee, 579 U.S. 261, 273 (2016) ("[T]he agency's decision to deny a petition is a matter committed to the Patent Office's discretion.").

If the Director decides not to institute review, that decision is "final and nonappealable." 35 U.S.C. §§ 314(d), 324(e).  But a disgruntled patent challenger has a second avenue to challenge a patent: challenges to a patent's validity may be brought in U.S. District Court either instead of an AIA petition or following the Director's decision not to institute an AIA trial.  See Credit Acceptance Corp. v. Westlake Servs., 859 F.3d 1044, 1052–53 (Fed. Cir. 2017).

Congress did cabin the Director's discretion to decline to institute an AIA trial in one important way: 35 U.S.C. §§ 316 and 326 require that "the Director . . . prescribe regulations . . . setting forth the standards for the showing of sufficient grounds to institute" an AIA trial.  Compl. ¶ 26 (cleaned up) (quoting 35 U.S.C. §§ 316(a), 326(a)).  The USPTO has accordingly designated "as precedential or informative certain cases that identify considerations for the Board's exercise of the Director's discretion over the institution decision."  Defs.' Mot. to Dismiss [ECF No. 6] ("Mot. to Dismiss") at 5.  "The principles announced in some of those cases have also been

Appx3

incorporated into a Consolidated Trial Practice Guide." <u>Id.</u> at 6. And in October 2020, the Director "issued a request for comments seeking the public's view on 'considerations for instituting trials' before the Board under the AIA." <u>Id.</u>; <u>see also</u> Ex. B to Compl. [ECF No. 1-2] ("USPTO Decision") at 2.

Plaintiffs' position is that the USPTO's approach to providing guidelines—designating some opinions "precedential" or "informative" without putting those considerations through notice-and-comment rulemaking—is unlawful. <u>See</u> Compl. ¶¶ 32–36 (describing this approach as an "end-run[]" around the APA and "extra-regulatory").[1] US Inventor expressed that same position in a lawsuit it filed in 2021 in the U.S. District Court for the Eastern District of Texas. <u>See</u> <u>US Inventor Inc. v. Hirshfeld</u>, 549 F. Supp. 3d 549, 553 (E.D. Tex. 2021) ("Plaintiffs generally allege that the Director's designation of such decisions as precedential constitutes unlawful rulemaking without the formal notice and comment required under the Administrative Procedures Act ('APA'), 5 U.S.C. § 553."), <u>aff'd sub nom.</u> <u>US Inventor Inc. v. Vidal</u>, No. 21-40601, 2022 WL 4595001 (5th Cir. Sept. 30, 2022), and <u>appeal dismissed</u> No. 2021-2212, 2022 WL 17246329 (Fed. Cir. Nov. 28, 2022). That case—which will be discussed throughout this Opinion—was dismissed for lack of standing in July 2021, <u>id.</u> at 559, a decision which was affirmed by the Fifth Circuit in September 2022, <u>US Inventor Inc. v. Vidal</u>, No. 21-40601, 2022 WL 4595001, at *7 (5th Cir. Sept. 30, 2022).

On August 27, 2020, following the dismissal of the Eastern District of Texas case, US Inventor and NSBU jointly filed a petition for rulemaking with the USPTO under 5 U.S.C. § 553(e). Compl. ¶ 13; <u>see</u> Ex. A to Compl. [ECF No. 1-1] ("Petition"). The petition proposed a

---

[1] Although plaintiffs' well-pleaded allegations are taken as true at the motion to dismiss stage, the Court need not accept "legal conclusions cast in the form of factual allegations," which many of plaintiffs' allegations in this section of their complaint are. <u>Browning v. Clinton</u>, 292 F.3d 235, 242 (D.C. Cir. 2002) (internal quotation marks omitted).

rule establishing a series of criteria the USPTO would use when deciding whether to institute an AIA trial.[2]  Compl ¶ 13; <u>see</u> Petition at 12–14.  On October 19, 2021, defendants denied the petition.  Compl. ¶ 14; <u>see</u> USPTO Decision at 3.  The USPTO stated that it, "in principle, supports the goal of providing clarity as to institution standards for AIA trials" and accordingly had requested "feedback from stakeholders on the current practices of the Patent Trial and Appeal Board in exercising discretion not to institute an AIA trial proceeding."  USPTO Decision at 2.  And because "[t]he issues raised in the Petition overlap [with] those raised in the" request for comments, it "<u>denie[d]</u> the Petition, with the understanding that suggestions provided in the Petition w[ould] be considered as part of any future rulemaking on AIA trials."  <u>Id.</u> at 3.

Plaintiffs challenge this denial.  Their complaint alleges a violation of the APA, 5 U.S.C. §§ 553, 555, and 706.  Compl. ¶¶ 46–62.  There are a few dimensions to their claim.  First, plaintiffs claim that the USPTO violated § 555(b)'s procedural requirement "that 'within a reasonable time, each agency shall proceed to conclude a matter presented to it,'" <u>id.</u> ¶ 52 (quoting § 555(b)), by stating that plaintiffs' rulemaking suggestions "would be considered only in unspecified 'future rulemaking on AIA trials,'" <u>id.</u> ¶ 62.  Section 706 allows enforcement of this requirement by "requir[ing] [courts] to 'compel agency action unlawfully withheld or unreasonably delayed.'"  <u>Id.</u> ¶ 47 (quoting § 706(1)).

Plaintiffs also challenge the denial of the petition under § 555(e), which requires that the USPTO provide notice of the denial and that such notice "shall be accompanied by a brief statement of the grounds for denial."  Compl. ¶ 53 (quoting § 555(e)).  According to plaintiffs, "[t]he USPTO's reasoning that it will not presently commence with rulemaking because it may

_____

[2] The petition also suggested a rule defining "privy," <u>see</u> Petition at 12, which is not at issue in this case.

commence with rulemaking later is <u>not</u> a 'statement of the grounds for denial' required under the APA" and is also arbitrary and capricious. <u>Id.</u> ¶ 61.

Finally, plaintiffs argue that the AIA's statutory framework requires the USPTO to promulgate "regulations to address the factors governing denial of AIA trial petitions" via notice-and-comment rulemaking, and accordingly, plaintiffs claim that "[i]n view of th[at] statutory framework . . . and the USPTO's obligation to properly address the Petition, the Denial was contrary to law." <u>See id.</u> ¶¶ 49–51, 54–59.

Plaintiffs accordingly seek (1) "[a] declaration that [defendants] unlawfully denied the Petition because the absence of regulations governing AIA trial institution factors is contrary to 35 U.S.C. §§ 316(a) and 326(a)," (2) "[a] declaration that [defendants'] denial of the Petition was an action unlawfully withheld, was arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law," and (3) "[v]acatur of the USPTO's decision to deny the Petition and an order that the USPTO promptly act to conclude the matter presented to it [in] the Petition in compliance with law." Compl. at 21.

Defendants filed the present motion to dismiss on September 30, 2022. <u>See</u> Mot. to Dismiss. Plaintiffs responded in opposition on November 15, 2022, <u>see</u> Pls.' Resp. & Mem. in Opp'n to Mot. to Dismiss [ECF No. 13] ("Opp'n"), and defendants filed a reply in support of their motion on December 15, 2022, <u>see</u> Defs.' Reply in Supp. of Mot. to Dismiss [ECF No. 16] ("Reply").

On the same day it filed its motion to dismiss, defendants also filed a motion asking the Court to excuse them from the requirements of Local Civil Rule 7(n), which requires defendant agencies to provide plaintiffs with an administrative record and file an administrative index record with the Court. <u>See</u> Defs.' Mot. for Relief from Compliance with Local Rule 7(n) & Mem. in Supp. [ECF No. 7] ("Mot. for Relief"). Plaintiffs filed an opposition this motion, <u>see</u> Pls.' Resp.

in Opp'n to Mot. for Relief and Mem. in Supp. of Opp'n [ECF No. 14] ("Opp'n to Mot. for Relief"), and defendants filed a reply in support of its motion, see Defs.' Reply in Supp. of Mot. for Relief [ECF No. 17]. Both motions are now ripe for decision.

## Analysis

### I.    Motion to Dismiss

Defendants move to dismiss the complaint for lack of standing. Plaintiffs bear the burden of establishing standing and, to do so, "must state a plausible claim that [they have] suffered an injury in fact fairly traceable to the actions of the defendant that is likely to be redressed by a favorable decision on the merits." Humane Soc'y of the U.S. v. Vilsack, 797 F.3d 4, 8 (D.C. Cir. 2015). "Injury in fact is the 'invasion of a legally protected interest which is (a) concrete and particularized . . . and (b) actual or imminent, not conjectural or hypothetical.'" Arpaio v. Obama, 797 F.3d 11, 19 (D.C. Cir. 2015) (quoting Lujan v. Defs. of Wildlife, 504 U.S. 555, 560 (1992)). In general, "when considering any chain of allegations for standing purposes, [courts] may reject as overly speculative those links which are predictions of future events (especially future actions to be taken by third parties)." Food & Water Watch, Inc. v. Vilsack, 808 F.3d 905, 913 (D.C. Cir. 2015) (cleaned up). Thus, "[t]he 'causal connection between the injury and the conduct complained of' must be 'fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court.'" Arpaio, 797 F.3d at 19 (quoting Lujan, 504 U.S. at 561). "And it must be 'likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.'" Id. (quoting Lujan, 504 U.S. at 561).

In assessing a motion to dismiss for lack of standing, courts "accept facts alleged in the complaint as true and draw all reasonable inferences from those facts in the plaintiffs' favor." Humane Soc'y, 797 F.3d at 8. However, courts "do not assume the truth of legal conclusions, nor

6

Appx7

do [they] accept inferences that are unsupported by the facts set out in the complaint." <u>Arpaio</u>, 797 F.3d at 19 (cleaned up).

Not every denial of a petition for rulemaking confers Article III standing on the petitioner. <u>See</u> <u>Gettman v. Drug Enf't Admin.</u>, 290 F.3d 430, 433 (D.C. Cir. 2002) ("The fact that Congress may have given all interested parties the right to petition the agency does not in turn 'automatic[ally]' confer Article III standing when that right is deprived."). Instead, to make out a viable challenge to the denial of the petition in federal court, plaintiffs must show that the deprivation of the procedural right—here, the denial of the petition—caused an "injury in fact, both particularized and concrete, as required by the Constitution." <u>Id.</u> at 434.

Organizational plaintiffs like US Inventor and NSBU can establish such standing in two ways: they "may assert standing on [their] own behalf," known as "organizational standing," <u>see</u> <u>Food & Water Watch</u>, 808 F.3d at 919, or they may assert "associational standing" based on injuries to the organizations' members, <u>see</u> <u>Sierra Club v. E.P.A.</u>, 754 F.3d 995, 999 (D.C. Cir. 2014). Plaintiffs assert standing under both theories.

**A. Organizational Standing**

"Courts in this Circuit use a 'two-part inquiry' for assessing whether an organization has sufficiently alleged injury-in-fact, asking 'first, whether the agency's action or omission to act injured the organization's interest and, second, whether the organization used its resources to counteract that harm.'" <u>Commissioned Officers Ass'n of U.S. Pub. Health Serv. v. Bunch</u>, Civ. A. No. 21-853 (JDB), 2022 WL 951271, at *4 (D.D.C. Mar. 30, 2022) (quoting <u>Food & Water Watch</u>, 808 F.3d at 919), <u>reconsideration denied</u>, Civ. A. No. 21-853 (JDB), 2022 WL 2290538 (D.D.C. June 25, 2022). "[A]n organization's use of resources for litigation, investigation in anticipation of litigation, or advocacy is not sufficient to give rise to an Article III injury," <u>Food & Water Watch</u>, 808 F.3d at 919; rather, the challenged action must have "perceptibly impaired the

organization's ability to provide services," id. (quoting Turlock Irrigation Dist. v. FERC, 786 F.3d 18, 24 (D.C. Cir. 2015)).  Such injury must be "more than simply a setback to the organization's abstract social interests," and the expenditure of "operational costs" that do not go "beyond those normally expended to review, challenge, and educate" about the subject matter are insufficient. Nat'l Taxpayers Union, Inc. v. United States, 68 F.3d 1428, 1433–34 (D.C. Cir. 1995) (internal quotation marks omitted).

Plaintiffs assert that "US Inventor and NSBU have been harmed by [the denial of the petition] as organizations."  Compl. ¶ 45.  However, the complaint only asserts specific harms suffered by US Inventor, see id.; Ex. F. to Compl. [ECF No. 1-6] ("Malone Decl."), and plaintiffs do not focus argument in their opposition on either organization's standing in its own right. Particularly in light of the lack of opposition by plaintiffs, the Court agrees with defendants that neither organizational plaintiff has sufficiently pled organizational standing.

In a declaration attached to their complaint, plaintiffs allege that US Inventor is "hamstrung in its efforts to teach inventors about keeping their patents free of AIA trial reviews" and "is temporarily forced to advise its members that not participating in the U.S. patent system, reducing investments in inventing, and/or . . . keeping their inventions secret may now (solely because of AIA trial reviews) be the best way forward."  Malone Decl. ¶ 29.  Those "mitigation measures undermine [its] core mission of fostering innovation and helping inventors to achieve the American Dream, build businesses, and create jobs."  Id.  And, plaintiffs allege, due to the denial of the Petition, "US Inventor so far lacks a procedural way to give its comments on published proposed rules."  Id.

The first alleged harm—US Inventor's change in how to educate its members—is a quintessential example of a cost that does not go "beyond those normally expended to . . . educate" its members.  Nat'l Taxpayers Union, 68 F.3d at 1434.  And to the extent that US Inventor's

complaint is that the resultant change in <u>subject matter</u> about which it must educate its members "undermine[s] [its] core mission," Malone Decl. ¶ 29, that complaint is nothing more than "frustration of its purpose," <u>Food & Water Watch</u>, 808 F.3d at 919, which "is the type of abstract concern that does not impart standing," <u>id.</u> (quoting <u>Nat'l Taxpayers Union</u>, 68 F.3d at 1433). <u>See</u> <u>US Inventor</u>, 2022 WL 4595001, at *6 (finding no organizational standing as US Inventor "ha[d] not shown how their specified activities actually differ from US Inventor's routine operations or how the Director's alleged failure to promulgate rulemaking has caused US Inventor to depart from its ordinary activities").

US Inventor's complaint that it "lacks a procedural way to give its comments on published proposed rules," Malone Decl. ¶ 29, is similarly lacking. "[A]n organization cannot show injury-in-fact just by alleging that agency action will make future lobbying . . . efforts more difficult." <u>Commissioned Officers Ass'n</u>, 2022 WL 951271, at *6 (citing <u>Food & Water Watch</u>, 808 F.3d at 920). US Inventor's utilization of methods other than submitting comments on proposed rules to advocate for its policy positions is an "operational cost[] . . . normally expended to carry out its advocacy mission" and is insufficient to confer standing. <u>Nat'l Ass'n of Home Builders v. E.P.A.</u>, 667 F.3d 6, 12 (D.C. Cir. 2011) (internal quotation marks omitted). Under this theory of standing, any individual or organization that may have an interest in administrative decisions could have standing to bring a claim such as this. "[S]uch a result is untenable," and thus courts "require more concrete allegation of harm . . . before finding sufficient injury in fact." <u>Nat'l Taxpayers Union</u>, 68 F.3d at 1434.

Hence, the Court concludes that neither plaintiff has organizational standing.

**B. Associational Standing**

Plaintiffs primarily rely on an associational standing theory, which premises an organization's standing on the standing of its individual members. To establish associational

standing, organizations must show that "(1) at least one of their members would have standing to sue; (2) the interests they seek to protect are germane to the organizations' purposes; and (3) neither the claim asserted nor the relief requested requires the participation of individual members." Sierra Club, 754 F.3d at 999.

US Inventor's membership includes individuals and businesses who own patents and "who were, are and will be respondents to" AIA trials. Compl. ¶ 5. Some of those members would, if available, "use rules promulgated under the rulemaking Petition . . . to 'veto' being hauled into a PTAB trial." Id. Without that "veto" power that the proposal in the Petition would grant them, plaintiffs allege, members would "face an increased risk of patent cancellation under PTAB procedures biased against patent owners." Id. As to the other two requirements of associational standing, plaintiffs allege that the interests here are "connected to US Inventor's purpose" and "neither the present claim nor the relief requested requires participation of US Inventor's members." Id. ¶ 7. Plaintiffs make similar claims about NBSU and its members. See id. ¶ 8; see also id. ¶ 45 ("Numerous members of US Inventor and NSBU have been directly harmed and continue to be harmed by Denial of the Petition.").

In opposition, the government argues that any injury suffered by plaintiffs' members due to the denial of the Petition is too speculative to confer Article III standing. Mot. to Dismiss at 14 ("Plaintiffs . . . do not (and cannot) demonstrate that the denial of the Rulemaking Petition (and the resulting absence of notice-and-comment rulemaking) has actually negatively and concretely affected [members'] patent rights."). As the government explains, in order for that harm to be realized, the following chain of events must occur:

> (1) a third party will file an IPR or PGR petition for review of a specific patent held by a member of each of their organizations; (2) the IPR or PGR petition would satisfy the minimum standards for institution of such a proceeding; (3) the Board would not exercise the Director's discretionary authority to decline institution under the current guidance, but would do so under a new regulation that the USPTO would adopt if it had granted Plaintiffs' Rulemaking Petition; and (4) the institution

10

of IPR or PGR proceedings creates a substantially higher probability of improper cancellation of the patent than adjudication of the same claims through other proceedings, such as district court litigation.

Id. at 16; see also US Inventor, 2022 WL 4595001, at *3 (identifying a similar chain of injury). At first glance, this chain of events seems quite speculative. And it seems even more so when taking into account the independent likelihood of each event's occurrence and the amount of "speculation about the decisions of independent actors." See Clapper v. Amnesty Int'l USA, 568 U.S. 398, 414 (2013). For their part, plaintiffs argue that each of these steps is highly likely to happen such that "Plaintiffs' members' risk of harm is both sufficiently imminent and substantial." Opp'n at 24. But their reasons for why each event is likely to occur do not hold up under scrutiny.

To begin, the IPR and PGR processes start with a third party filing a petition with the USPTO. That action itself—which is required to set off this chain of injury—is entirely within the control and discretion of a third party. See US Inventor, 2022 WL 4595001, at *4 ("This case presents a . . . chain of events requiring us to speculate—at minimum—whether a . . . third-party challenge will occur . . . ."). Plaintiffs claim that they have "described generally, and named specifically, patent owner-members . . . who have faced, are facing, and will continue to face IPR and PGR proceedings." Opp'n at 32. Members who have already faced AIA proceedings cannot confer standing to plaintiffs to bring a claim for prospective relief, see City of L.A. v. Lyons, 461 U.S. 95, 105 (1983) (noting that past injury "does nothing to establish a real and immediate threat"), and identifying members who might face IPR and PGR proceedings—if a third party files a petition against them—is still a speculative link in the chain, see Cierco v. Mnuchin, 857 F.3d 407, 418 (D.C. Cir. 2017) (noting that courts "are particularly disinclined 'to endorse standing theories that rest on speculation about the decisions of independent actors'" (quoting Clapper, 568 U.S. at 414)).

Plaintiffs assert that the USPTO's denial of the petition caused a concrete injury because, by declining to grant the petition and instead relying on the current framework for discretionary denials, the PTAB will institute AIA Trials against members that otherwise would not have been instituted.  To begin, there are numerous reasons unrelated to the proposed rule changes in plaintiffs' petition why the PTAB would decline to institute AIA proceedings following the submission of a petition by a third party.  These include merits reasons (which are captured in the second step of the injury chain), as the PTAB may only institute AIA proceedings if it "determines that . . . there is a reasonable likelihood that the [patent challenger] would prevail with respect to at least 1 of the claims challenged in the petition," 35 U.S.C. § 314(a); see also id. § 324, as well as discretionary denials under the current guidance.  Those reasons make it substantially less likely that, had plaintiffs' petition been granted, any proposed change contained therein would be dispositive in any particular decision not to institute an AIA trial against a member.

Plaintiffs claim that they can identify members that would, in fact, face an AIA Trial under the current system but would not if defendants had granted plaintiffs' petition, but plaintiffs fail to actually do so.  For example, plaintiffs point to a company called 10Tales as an example of a member "whose imminent injury-in-fact is palpable."  Opp'n at 10; see Malone Decl. ¶¶ 18–19. But by plaintiffs' own telling, "the PTAB denied [AIA trial] institution on the merits of patentability on August 13, 2021" without even reaching consideration of the discretionary factors that the proposed rule would change.  Malone Decl. ¶ 18 (emphasis added).  10Tales' situation underscores why the injury—even to those members who have had petitions filed against them— remains speculative, as the likelihood that an AIA trial would be instituted under the current rules but would not be instituted had defendants granted plaintiffs' petition is slim.

Of course, there may be some challenges to members' patents that make it past the merits stage, rendering the PTAB's exercise of discretion the only route by which members can avoid an

AIA trial. For example, the current guidance does not formally provide that the PTAB should take into account a patent owner's status as a small business when deciding whether to institute an AIA trial, while plaintiffs' Petition proposes that the PTAB should take into account "the economic small entity status of the patent owner." Opp'n at 28; see Petition at 13. Thus, plaintiffs argue, for members that are small businesses, the likelihood of injury is not speculative because if "the Petition for rulemaking proceeding [were] granted," the "likely result" would be that the PTAB would decline to institute an AIA trial in those situations "due to the economic small entity status of the patent owner." Opp'n at 28. But even if the Court assumes "that any future, final regulation would have discrete and bright-line rules exempting [their members],"[3] Reply at 13, that injury analysis still requires speculation as to whether an individual decision-maker would in fact institute an AIA trial against a patent holder. Even under the current guidance—which does not contain any express exception for small businesses—the PTAB could certainly exercise its discretion to deny institution on that basis or otherwise. See US Inventor, 549 F. Supp. 3d at 553 (collecting cases holding that "the agency's decision to deny a petition is a matter committed to the Patent Office's discretion"). In sum, plaintiffs have not shown that the likelihood of injury for any given member—even members whose patents have a petition filed against them, which then passes the merits stage of non-institution—is likely to be different because plaintiffs have not demonstrated the likelihood that a "patentee-favorable" notice-and-comment rule would alter the discretionary institution decision.[4]

---

[3] In challenging a procedural injury, the Court relaxes "the normal standards for redressability and immediacy" and requires plaintiffs to show only that they have been denied "a procedural right" that would "protect [their] concrete interests." Lujan, 504 U.S. at 573 n.7. Plaintiffs thus do not need to "establish with any certainty" that a ruling in their favor here would cause the petition to, in fact, be granted. Id.

[4] This is not to say that entities like plaintiffs will never have standing to challenge a proposed change to a discretionary consideration. But the likelihood of the exercise of discretion, combined with the numerous other speculative links in the chain, contributes to the uncertain nature of the injury in this case.

Finally, plaintiffs' complaint identifies the harm to members as not just the AIA trial institution, but also as the resultant patent cancellation at the conclusion of that trial.  See, e.g., Compl. ¶ 7 (describing "members' interest in preserving their patent rights from cancellation").  Thus, under step four of the injury chain, plaintiffs must show a high likelihood that patents would be cancelled through AIA trials (once instituted) that otherwise would not be with the proposed rule change.  Defendants respond that the actual risk of patent cancellation is the same, or at least not significantly different, whether or not AIA proceedings are instituted because patent challengers may always challenge a patent in district court, and thus patents that are actually invalid are likely to be cancelled through that process in any event.  See Mot. to Dismiss at 16; see also US Inventor, 2022 WL 4595001, at *4 (noting that standing analysis requires speculation as to "how a district court would otherwise rule on the patent claims at issue").  Plaintiffs argue that patent cancellation is more likely through an AIA trial than in a district court proceeding, relying on statistics showing higher rates of cancellation in AIA trials.  See Compl. ¶ 5; Malone Decl. ¶ 11 (explaining that "PTAB invalidates (in whole or in part) 84% of patents that reach a final decision" and "federal court cases that reach a final decision on the question of patent validity result in invalidity only about 29% of the time").  Those numbers appear shocking until the reader realizes that PTAB proceedings are only authorized if the USPTO believes there is a high likelihood of invalidity.  See Mot. to Dismiss at 16–18 (describing issues with these statistics).  Defendants thus counter that when one takes into account all AIA petitions, not just those that reach a final decision, "the Board found the challenged patent to be all or partially unpatentable only 21% of the time in fiscal year 2021."  Id. at 17.

The Court is hesitant to draw any sort of conclusion from these statistics given the numerous factors discussed in this Opinion that affect a third party's decision to petition the PTAB and the PTAB's decision to institute a trial.  "[S]imply comparing patent challenges in an IPR/PGR

14

to challenges in a district court is likely an apples-to-oranges comparison that fails to meet the rigor [courts] expect in a standing analysis."  US Inventor, 2022 WL 4595001, at *3 n.4. Accordingly, there is no basis for this Court to conclude that a higher rate of institution is likely to appreciably increase the risk of injury to plaintiffs' members, given that there is no compelling reason to conclude the chances of cancellation are any different in AIA trials versus federal district court proceedings.

In their opposition, plaintiffs argue that they can show injury without demonstrating a higher risk of patent cancellation as their members "suffer harm to their reputation and good will at the point of institution, regardless of the ultimate determination of patentability."  Opp'n at 21–22 (citing Malone Decl. ¶ 28 and Ex. G. to Compl. [ECF No. 1-7] ("Sherman Decl.") ¶ 11).  As an initial matter, these allegations appear only briefly in declarations attached to the complaint—they appear nowhere in the complaint itself, despite multiple paragraphs describing the alleged harm of patent cancellation to plaintiffs' members.  See Compl. ¶¶ 5–8.  Even crediting that those declarations are sufficient, plaintiffs still have not identified a sufficiently concrete and imminent injury.  To be sure, focusing on reputational harm may take away one step in the chain—the alleged difference in outcomes in AIA trials versus federal court—but it adds a new dimension of uncertainty: per the plaintiffs' own declarations, the reputational harm can begin at the filing of the IPR petition, a stage at which plaintiffs' proposed rule changes would have no impact.  See Sherman Decl. ¶ 11 (noting that "[t]he pendency of the IPR petition"—which begins when the petition is filed and thus before any change from the proposed rule—"was a negative development for our company, even though it was eventually denied").  And even believing plaintiffs' unsupported arguments in their opposition that reputational harm attaches only at the point of institution, there remains a series of other speculative assumptions leading up to the institution decision that defeats their standing claim.  Cf. US Inventor, 2022 WL 4595001, at *5 ("[E]ven if

15

we assume [one link to be certain], we must still make a series of improperly speculative assumptions.").

In sum, plaintiffs' theory of injury is too speculative to describe a concrete injury from defendants' denial of their petition.  Plaintiffs rely on a "specific, uncertain series of events" based on "conjecture about how independent third parties, i.e. the PTAB and a district court, would act." US Inventor, 2022 WL 4595001, at *4.  The injury chain here closely resembles that in Clapper, where the Supreme Court rejected a theory of standing based on a "highly attenuated chain of possibilities" as to agency, court, and third-party action.[5]  See 568 U.S. at 410; id. at 414 ("We decline to abandon our usual reluctance to endorse standing theories that rest on speculation about the decisions of independent actors.").  This Court accordingly lacks subject-matter jurisdiction over plaintiffs' claim and will grant defendants' motion to dismiss on that basis.[6]

## II.    Motion for Relief

Defendants also move for relief from Local Civil Rule 7(n), which provides that

[i]n cases involving the judicial review of administrative agency actions, unless otherwise ordered by the Court, the agency must file a certified list of the contents of the administrative record with the Court within 30 days following service of the answer to the complaint or simultaneously with the filing of a dispositive motion, whichever occurs first.

Defendants argue that "[n]one of th[eir] arguments require the Court or Plaintiffs to review the administrative record to either adjudicate or defend against the motion," Mot. for Relief at 1–2,

---

[5] The specific chain of injury in Clapper was:

(1) the Government will decide to target the communications of non-U.S. persons with whom they communicate; (2) in doing so, the Government will choose to invoke its authority under § 1881a rather than utilizing another method of surveillance; (3) the Article III judges who serve on the Foreign Intelligence Surveillance Court will conclude that the Government's proposed surveillance procedures satisfy § 1881a's many safeguards and are consistent with the Fourth Amendment; (4) the Government will succeed in intercepting the communications of respondents' contacts; and (5) respondents will be parties to the particular communications that the Government intercepts.

568 U.S. at 410.

[6] Because the Court concludes that it lacks jurisdiction over plaintiffs' claim, it will not address defendants' issue preclusion arguments.  See Mot. to Dismiss at 22–24.

Appx17

and that granting such relief will "conserv[e] scarce agency resources," Defs.' Reply in Supp. of

Mot. for Relief at 2 (quoting Akbar v. Cuccinelli, Civ. Case No. 18-2808, 2020 WL 1287817, at

*4 (D.D.C. Mar. 18, 2020)).  Plaintiffs oppose the motion for relief, arguing that "Defendants'

Motion to Dismiss will likely require the Court and Plaintiffs to invoke the administrative record,"

Opp'n to Mot. for Relief at 2, and accordingly ask the Court to "await production of the record"

before deciding defendants' motion to dismiss, id. at 5.  In support, plaintiffs offer four categories

of documents they believe would be relevant:

1.  "Internal USPTO discussion of Plaintiffs' Rulemaking Petition," which "likely include

    reflection on how Plaintiff Associations' small entity memberships would benefit from

    promulgation of the proposed rule";

2.  "[A]nalysis of the economic impact of a potential regulation" and its effect on the

    patent system and USPTO;

3.  Documents that speak to "Defendants' subjective awareness of the impropriety in

    denying" the petition; and

4.  Evidence that "highlight[s] differences in the substantive legal questions between" the

    Eastern District of Texas litigation and this case.

Opp'n to Mot. for Relief at 2–3.

The Court is empowered to grant defendants such relief, and courts in this District routinely

do so when "the administrative record is not necessary for [the court's] decision."  Nohria v.

Renaud, Civ. A. No. 20-cv-2085, 2021 WL 950511, at *4 n.3 (D.D.C. Mar. 14, 2021) (internal

quotation marks omitted).  Here, the Court agrees with defendants that the administrative record

is unnecessary to resolve the current motion.  As discussed in detail above, the Court concludes

that plaintiffs lack standing to bring this claim.  The administrative record would contain evidence

17

Appx18

relating to defendants' denial of plaintiffs' petition—not records related to individual members' AIA trials or institution decisions, which may have at least some bearing on the standing analysis.

Indeed, none of the documents identified by plaintiffs as potentially relevant would change the standing analysis.  In deciding that plaintiffs lack standing, the Court accepted plaintiffs' assertion that it has members who <u>could</u> receive a different institution decision if the proposed rule was promulgated in its current form.  The USPTO's agreement with that assessment would thus not move the needle on how speculative members' potential injuries are.  The second and third categories of documents relate squarely to merits, not to standing: the standing analysis assumes that defendants acted improperly in denying the petition and asks whether that denial has injured plaintiffs.  Documents proving that the denial was improper—either because the proposed rule would have significant benefits or because of some subjective assessment by defendants—would not speak to members' injury.  And the fourth category is relevant only to issue preclusion, which the Court does not reach.

Accordingly, the Court will grant defendants' motion for relief from Local Civil Rule 7(n) and will not require them to compile an administrative record in this case.

## <u>Conclusion</u>

For the reasons discussed above, the Court concludes that plaintiffs lack standing to bring their APA claim and the Court accordingly lacks subject-matter jurisdiction over this case.  It comes to this conclusion without any need for review of the administrative record.  The Court will accordingly dismiss the case in its entirely.  A separate Order consistent with this Opinion will issue on this date.

18

_____/s/_____
JOHN D. BATES
United States District Judge

Dated: <u>July 12, 2023</u>

Appx20

**CERTIFICATE OF SERVICE**

I hereby certify that on March 26, 2024, the Brief of Appellants was filed with the Clerk of the Court for the United States Court of Appeals for the Federal Circuit by using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

*/s/ Robert Greenspoon*
ROBERT GREENSPOON
Counsel for Appellants

FORM 19. Certificate of Compliance with Type-Volume Limitations

Form 19
July 2020

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:** 24-1396

**Short Case Caption:** US Inventor, Inc., et al. v. United States Patent and Trademark Office, et al.

> **Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☑ the filing has been prepared using a proportionally-spaced typeface and includes 8,435 words.

☐ the filing has been prepared using a monospaced typeface and includes _____ lines of text.

☐ the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date: 03/26/2024

Signature: /s/ Robert Greenspoon

Name: /s/ Robert Greenspoon

Save for Filing