**2024-1396**

# United States Court of Appeals for the Federal Circuit

US INVENTOR, INC., NATIONAL SMALL BUSINESS UNITED,

*Plaintiffs-Appellants,*

– v. –

UNITED STATES PATENT AND TRADEMARK OFFICE, KATHERINE K. VIDAL, Under Secretary of Commerce for Intellectual Property and Director of the United States Patent and Trademark Office,

*Defendants-Appellees.*

*On Appeal from the United States District Court for the District of Columbia, No. 1:22-cv-02218-JDB. The Honorable John D. Bates, Judge Presiding.*

## REPLY BRIEF FOR APPELLANTS

ROBERT GREENSPOON
JONATHAN HILL
DUNLAP BENNETT & LUDWIG PLLC
333 North Michigan Avenue,
Suite 2700
Chicago, Illinois 60601
(312) 551-9500
rgreenspoon@dbllawyers.com
jhill@dbllawyers.com

*Counsel for Appellants*

JULY 9, 2024

COUNSEL PRESS, LLC (888) 277-3259

# TABLE OF CONTENTS

**Page**


TABLE OF AUTHORITIES ........................................................................ ii

I. ARTICLE III STANDING EXISTS ................................................................1

A. This Court Already Found That Standing Exists on the Facts of This Case in *Apple v. Vidal*................................................................1

B. New Supreme Court Authority Confirms Article III Standing.............5

C. Naming Specific Members is Not Necessary at the Pleading Stage, but Appellants Adequately Named Several ...............................8

D. Appellants' Statistics Carry Weight and Demonstrate Standing..........................................................................................13

II. THIS APPEAL IS NOT MOOT.....................................................................18

III. CONCLUSION............................................................................................21

## TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Apple v. Vidal*,
63 F.4th 1 (Fed. Cir. 2023) ........ *passim*

*Arcia v. Florida Secretary of State*,
772 F.3d 1335 (11th Cir. 2014) ........ 3

*Ass'n of Am. Physicians & Surgeons, Inc., v. Sebelius*,
901 F. Supp. 2d 19 (D.D.C. 2012) ........ 3, 8

*Cierco v. Mnuchin*,
857 F.3d 407 (D.C. Cir. 2017) ........ 5

*City of Los Angeles v. Lyons*,
461 U.S. 95 (1983) ........ 9

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) ........ 5

*Cleveland Branch of the NAACP v. City of Parma*,
263 F.3d 513 (6th Cir. 2001) ........ 3

*Food & Water Watch, Inc. v. Vilsack*,
808 F.3d 905 (D.C. Cir. 2015) ........ 15

*Guarascio v. FBI*,
No. 18-cv-2791 (CRC), 2023 U.S. Dist. LEXIS 195765 (D.D.C. Nov. 1, 2023) ........ 4

*In re International Union, United Mine Workers of Am*.,
231 F.3d 51 (D.C. Cir 2000) ........ 18

*NRDC v. Wheeler*,
955 F.3d 68 (D.C. Cir. 2020) ........ 16

*Oregon Advocacy Center v. Mink*,
322 F.3d 1101 (9th Cir. 2003) ........ 3

*Public Citizen, Inc. v. National Traffic Safety Administration*,
489 F.3d 1279 (D.C. Cir. 2007) ........ 9

*Public Citizen, Inc. v. National Traffic Safety Administration*,
513 F.3d 234 (D.C. Cir. 2008) ........ 9

*Summers v. Earth Island Institute*,
555 U.S. 488 (2009) ........ 8, 9

*Valley Forge Christian College v. Americans United for Separation of Church & State*,
454 U.S. 464 (1982) ........ 9

**Statutes & Other Authorities:**

5 U.S.C. § 553 ........ 5

5 U.S.C. § 553(c) ........ 19, 20, 21

5 U.S.C. § 553(e) ........ 18, 19, 20

35 U.S.C. § 314(a) ........ 17

35 U.S.C. § 324(a) ........ 17

# I. ARTICLE III STANDING EXISTS

## A. This Court Already Found That Standing Exists on the Facts of This Case in *Apple v. Vidal*

Despite lengthy argument from the USPTO that sidesteps germane parts of the decision (USPTO Br. 32-36), *Apple v. Vidal* shows that standing exists here. 63 F.4th 1 (Fed. Cir. 2023). This Court soundly concluded that rulemaking-related inaction by the USPTO, reducing the availability of AIA trials to a repeat accused infringer, causes Article III injury to that entity. *Id.* at 16-17. The USPTO fails to address this key point, which operates equally in the inverse.

Rules that *increase* the availability of AIA trials (or, inaction on rules that would reduce it) causes Article III injury to patent holders subject to being hauled involuntarily into such trials. *Id.* at 17 (noting that Apple benefits from "the applicability of a lighter burden of persuasion to prevail in challenging a patent claim than the burden applicable in district court."). This Court did not require Apple to support statistical comparisons, nor "specify in advance individual IPR requests" filed under agency rules that allegedly harmed it. *Id*. Rather, this Court (mirroring Appellants' arguments here) relied on the "substantial risk" that the alleged harm would recur in the future, based on the "history" of Apple as a "repeat player" in AIA trials. *Id.* at 16-17.

*Apple v. Vidal* is indistinguishable and controls the outcome here. Appellants' membership is a "repeat player" in exactly the same way. As Appellants plausibly

alleged, individual named members had to face AIA trial petitions without availability of the sought-after "veto" power of the proposed rules, and that precise scenario was capable of repetition among membership while the proposed rulemaking petition evaded judicial review. (Appx27, Appx43, Appx174-175, Appx184, Appx187, Appx228).

The "capable of repetition yet evading review" allegation is not only plausible (albeit, ignored in the USPTO's brief). It is true. For example, US Inventor member Terves, through its CEO Andrew J. Sherman, submitted a declaration with the Complaint in this case. (Appx101-105). Terves warned the district court that AIA trial attacks on its patents (in the magnesium processing field so important to national security) were a "clear and present danger" to Terves absent the petition-requested rulemaking, since he expected an "inevitable IPR that [Chinese competitors] would need to deepen entry into our market." (Appx102-104, ¶¶ 7, 13-14).

Later events unfortunately proved Mr. Sherman had the very clairvoyance that this Court does not even require. Those events align Terves with all criteria named by the district court that would indicate an association member has standing (*see* Section I.B, below). Specifically, after Rule 12(b) briefing concluded in this case, a Chinese entity filed IPR2023-00521 against a Terves patent. Terves sought both merits and discretionary denial (including seeking such denial by demonstrating that

the petitioner was a shill for the Chinese Communist Party). (IPR2023-00521, Paper 7, June 5, 2023 Preliminary Response). But the PTAB instituted trial anyway, because of the absence of Terves' veto power. (IPR2023-00521, Paper 14). As of this filing, the -00521 matter remains pending and the PTAB has not issued its final written decision.

This Court may also take judicial notice of the following US Inventor members who, during this appeal, received AIA trial petitions against their patents and are awaiting (or have received) the PTAB's institution decision—without the benefit of the veto-power rule:

> **ParkerVision, Inc.** (https://usinventor.org/portfolio-items/jeff-parker-inventor-co-founder-ceo-of-parkervision/): IPR2024-00934, -00935, -00936 (awaiting institution); IPR2024-00150 (instituted, pending).
>
> **Masimo Corp.** (https://usinventor.org/eventsponsors2023/): IPR2024-00241, -00242, -00243, -00244 (awaiting institution); IPR2024-00290 (instituted, pending).
>
> **Centripetal Networks, LLC** (https://usinventor.org/eventsponsors2023/): IPR2023-00445, -00446, -01329, 01353 (instituted, pending).

Two of these members additionally received unpatentability final written decisions during this same review-evasion period. (*E.g.*, IPR2022-01465 (Masimo), IPR2023-00448 (Centripetal)).

Through its silence on this exact point made expressly in the Opening Brief at pages 34-35, the USPTO implicitly agrees that once associational standing arises based on lack of the petitioned rule's "veto" as to any named member, such standing

is not "mooted" by conclusion of that member's AIA trial proceedings. This is at least because Appellants plausibly alleged that other members now fit, or with utter certainty will fit, the same standing criteria. *See Arcia v. Florida Secretary of State*, 772 F.3d 1335, 1342-43 (11th Cir. 2014) (organizational plaintiffs had associational standing even though government "actions [against members] too short in duration to be fully litigated prior to their cessation"); *Oregon Advocacy Center v. Mink*, 322 F.3d 1101, 1116-18 (9th Cir. 2003) (same, "the constant existence of OAC constituents suffering the deprivation is certain"); *cf. Cleveland Branch of the NAACP v. City of Parma*, 263 F.3d 513, 524-526 and n.11 (6th Cir. 2001) (associational standing determined only at time the complaint was filed, on which point the Sixth Circuit "join[ed] the First, Fifth, Seventh, Eighth and Ninth Circuits"); *Guarascio v. FBI*, No. 18-cv-2791 (CRC), 2023 U.S. Dist. LEXIS 195765, *13 (D.D.C. Nov. 1, 2023) (following *Parma* to hold standing determined as of time complaint filed). Crucially, for associational standing, a "plaintiff need not identify the affected members by name at the pleading stage." *Ass'n of Am. Physicians & Surgeons, Inc., v. Sebelius*, 901 F. Supp. 2d 19, 31 (D.D.C. 2012) (collecting cases); *cf. Apple v. Vidal,* 63 F.4th at 17 (not requiring Apple to "specify in advance individual IPR requests," which would have required clairvoyance).

Terves is a clear example that Appellants' "capable of repetition yet evading review" allegation is plausible, weighty and true, thus confirming that Appellants,

as national associations supporting inventor rights, through their members, stand in precisely the same shoes as Apple in *Apple v. Vidal*. ParkerVision, Masimo and Centripetal deepen the plausibility. Appellants are a "repeat player" in precisely the same way Apple is.

Since this Court has already ruled in favor of Article III standing on the same grounds as presented here, based on *stare decisis*, this Court should reverse.

### B. New Supreme Court Authority Confirms Article III Standing

Wholly apart from *Apple v. Vidal*, the Supreme Court just confirmed (albeit indirectly) that Article III standing exists in this case.

One week before the USPTO filed its responsive brief, the Supreme Court brought significant clarity to regulation-related Article III standing law in *Food & Drug Admin. v. Alliance for Hippocratic Med.*, No. 23-235 (June 13, 2024) ("*AHM*"). There, the Court drew a sharp division over how to analyze standing of "regulated" versus "unregulated" parties. It is only when "a plaintiff challenges the government's unlawful regulation (or lack of regulation) *of someone else*" that "standing . . . is ordinarily more difficult to establish" on grounds of "difficulty establishing causation—that is, linking their asserted injuries to the government's regulation (or lack of regulation) of someone else." *Id.* (slip op. 10) (emphasis in original, internal

quotations and citations omitted).[1] When instead a case concerns "[g]overnment regulations that require or forbid some action by the plaintiff," this "almost invariably satisf[ies] both the injury in fact and causation requirements. So in those cases, standing is usually easy to establish." *Id.* (slip op. 9).

Though the USPTO cites *AHM* exactly once (as a "*see also*" citation), it ignores its true significance. The USPTO cites *AHM* to argue that courts prefer not to endorse standing theories that speculate about decisions of independent actors causing injury. (USPTO Br. 29, also citing *Cierco v. Mnuchin*, 857 F.3d 407, 418 (D.C. Cir. 2017) and *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 (2013)).[2] But as mentioned, *AHM* clarifies that this proposition mostly concerns *unregulated* parties attempting to show causation linking government action to their injuries.[3]

---

[1] Plaintiffs in *AHM* underwent a more searching injury/causation analysis as *unregulated* parties, and could not establish a chain of causation linking certain FDA actions regarding Mifeprex and generic mifepristone to any nonspeculative injury.

[2] *Cierco* did not question the "injury" or "causation" prong (which the D.C. Circuit found present), but the "redressability" prong, since the Andorran government's intervening act closed the bank that had allegedly been harmed by the relevant Treasury rulemaking notice. *Cierco*, 857 F.3d at 418-19 (judicially declaring notice unlawful would not provide plaintiffs desired relief). "Redressability" is undisputed in this case, since a district court has the power to require the USPTO to comply with 5 U.S.C. § 553.

[3] The *Clapper* decision falls into the category of "unregulated" party standing, since Amnesty International sought to vindicate membership who were untargeted by the foreign-entity communication surveillance at bar. The *Clapper* decision relied on breaks in the chain of causation based on the theory of injury needing to speculate (implausibly) that FISA courts would incorrectly issue rulings that violated membership's constitutional rights. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398,

*AHM* indeed confirms several times that *property* impairments linked to governmental action (or inaction) fully qualify to establish causation and injury for standing. *AHM* (slip op. 8) ("An injury in fact can be . . . an injury to one's property"), (slip op. 12) ("When the government regulates one property, it may reduce the value of adjacent properties"), (slip op. 13) ("Nor do [doctor-plaintiffs] suffer injuries to their property, or to the value of their property"). *Accord, Apple v. Vidal*, 63 F.4d at 16-17.

This, of course, is a property-impaired-by-government case. The present case is not one (such as *AHM* itself) where the USPTO regulates only "someone else." Members of the Appellants are regulated parties, with respect to the petition for rulemaking in this case and the property that petition seeks to protect.

Current PTAB regulations require patentees to show up to defend their patents subject to AIA trial petitions, their only alternative being to let a challenger make *ex parte* assertions calculated to take their property away. The petition at issue proposes a rule that will bestow these very individuals—small inventor patentees—veto power over AIA trial institution in a manner that preserves income-generating and

414. In addition to this being a *regulated* party case (making *Clapper* inapposite under *AHM*), Appellants here do not hinge any argument on the PTAB incorrectly issuing institution or trial decisions, but instead note that injury occurs in part based on the PTAB's proclivity to rule at the invalidity rates it has long exhibited. *See Apple v. Vidal*, 63 F.4th at 17 (noting "burden of persuasion" differences between district court and AIA trials).

market-protection value of that intangible property, thus increases property values and entity valuation through protection from high risk of loss. The petition at issue aspires in this way to de-regulate patents that the USPTO current regulates in a particular way. As the flip-side of facts giving rise to Apple standing as a regulated party in *Apple v. Vidal*, these facts give rise to standing for Appellants.

### C. Naming Specific Members is Not Necessary at the Pleading Stage, but Appellants Adequately Named Several

Contrary to the USPTO's argument,[4] Appellants named specific individual member-patentees who have been and are harmed by the denial of the "veto power" petition for rulemaking. (Opening Br. 13, naming both 10Tales and persons "[b]eyond 10Tales," citing their identities as presented to the district court at Appx227-231, Malone Decl. ¶¶ 2-14: Messrs. Hardin, Hill, O'Keefe and Kilbourne, and Ms. Metz). This was actually overkill, because nothing required naming such individuals at this stage. *Ass'n of Am. Physicians & Surgeons, Inc.*, 901 F. Supp. at 31 (D.D.C. 2012) (analyzing *Summers v. Earth Island Institute*, 555 U.S. 488, 499 (2009), and agreeing with cases from the Second and Fifth Circuits that for associational standing, at the pleading stage, "the plaintiff need not identify an

[4] The USPTO incorrectly asserts that Appellants "forfeited" reliance on injuries of Hardin, Hill, O'Keefe, Kilbourne and Metz because Appellants supposedly did not identify them to this Court. (USPTO Br. 28). That is incorrect, as evident from page 13 of the Opening Brief specifically citing to members "beyond 10Tales" named in five point-cited pages of the appendix-record, and page 34 referring to "10Tales and others like it."

affected member by name."). None of the USPTO's cases (cited at USPTO Br. 24)[5] demands a showing of Article III associational standing via naming of harmed individuals at the *pleading* stage, when the type of alleged harm to membership qualifies as Article III injury.

Named or not, injury exists among Appellants' membership at least because of property value decrease caused by the availability of IPRs and PGRs (and conversely, value increase once these individuals acquire their "veto"). More specifically, the past and present inability of 10Tales, Hardin, Hill, O'Keefe, Kilbourne and Metz to steer their validity disputes to a more statistically friendly non-USPTO forum (or to nowhere at all, when no co-pending litigation exists)

[5] In *Summers*, the standing decision occurred after full adjudication of the merits of the regulatory challenge. 555 U.S. at 492. In *Valley Forge Christian College v. Americans United for Separation of Church & State*, 454 U.S. 464, 483-85 (1982), the alleged harm by membership was a disfavored "generalized grievance" and "psychological consequence presumably produced by observation of conduct" because a religious college received a land transfer from the government. In *Public Citizen, Inc. v. National Traffic Safety Administration*, 489 F.3d 1279, 1294-97 (D.C. Cir. 2007), the appeals court engaged in direct review of an agency petition decision and (crucially) requested supplemental submissions to permit appellate-phase determination of standing. Its later analysis did not require naming of individuals, but assumed that a statistical showing without such identification would suffice. 513 F.3d 234, 238-41 (D.C. Cir. 2008) (on supplemental proceedings, finding lack of standing after statistics failed to show "difference in risk injury" for unnamed membership based on tire inflation standards). Lastly, *City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983), was not an associational standing case, but review of a preliminary injunction against Los Angeles police chokeholds. There, the plaintiff could not establish an immediate threat he would be stopped for a future traffic violation and thereafter suffer an illegal chokehold. *Id.*

degrades their patent-property value. The USPTO's brief overlooks such injuries among these individuals, and among Appellants' membership generally. And, the USPTO is silent about Appellants' showing that such injury (particularly among association membership, like Terves) is likely to recur while evading review. (Opening Br. 34-35).

For example, the district court itself acknowledged that if an Appellant-member had "a petition filed against them, which then passes the merits stage of non-institution," standing could exist on a "demonstra[tion of] the likelihood that a 'patentee-favorable' notice-and-comment rule would alter the discretionary institution decision." (Appx14, underlining in original). Though the district court found this pathway inapplicable to 10Tales because its matter was pending on reconsideration after 10Tales *won* non-institution on *merits* grounds (Appx13), this does amply describe the plight of Hardin and Hill (plus Terves, mentioned above). Hardin and Hill had numerous IPRs filed against their patents, they made both merits and then-available discretionary arguments for non-institution, but they were still awaiting the institution decision at the time of Rule 12(b) briefing in this case. (Appx228-229). By the time of the district court's decision (July 12, 2023), the PTAB had instituted on all of them, rejecting all non-institution arguments that Hardin and Hill presented. *See, e.g.,* IPR2022-01333, -01334, -01335 (Paper 17) (July 26, 2023) ("Termination Due to Settlement After Institution of Trial").

Thus, Appellants did indeed identify specific individuals by name to the district court, whom the district court ignored, several of whom would categorically have benefited at the precise time of the Rule 12(b) briefs and resulting order from the veto power embodied in the petition for rulemaking. (Appx175). No one questions that Hardin's and Hill's plight (the plight the district court identified as prospectively creating Article III standing) recurs nearly every day: the PTAB decides to institute by rejecting both merits and discretionary arguments from patentees, on patents that would otherwise earn "veto" power under Appellant's proposed rule because they are owned by innovative small entities who would be covered by the proposed rule. Terves is living proof that Appellants plausibly alleged such recurrences among Appellants' membership (*see* Section I.A, above). And no one disputes that situations such as Hardin's and Hill's are likely to recur while the present rulemaking-petition-judicial-review evades review during every short six-month window before every future institution decision. Indeed, the USPTO (like the district court before it) ignores the "likely to recur while evading review" issue (alleged, argued and supported factually at Appx27, Appx43, Appx174-175, Appx184, Appx187, Appx228), never once even giving it passing treatment.

Whether standing analysis during the present appeal focuses on 10Tales, focuses on Hardin and Hill, or both, the USPTO fails to dispute that the district court's own four-part framework exactly covers each of them:

| **District Court Test That, If Met, Establishes Article III Causation and Injury (from Appx11-12)** | **10Tales** | **Hardin & Hill** |
|---|---|---|
| (1) A third party will file an IPR or PGR petition for review of a specific patent held by a member of each of their organizations; | Satisfied. (Appx93-94). | Satisfied. (Appx227-231). |
| (2) the IPR or PGR petition would satisfy the minimum standards for institution of such proceeding; | Imminently threatened during reconsideration proceedings pending at the time of Rule 12(b) briefing. (Appx93-94). | Satisfied. IPR2022-01333, -01334, -01335 (Paper 17) (July 26, 2023) (Termination Due to Settlement After Institution of Trial). |
| (3) the PTAB would not exercise the Director's discretionary authority to decline institution under the current guidance, but would do so under a new regulation that the USPTO would adopt if it had granted Plaintiffs' Rulemaking Petition; | Imminently threatened during reconsideration proceedings pending at the time of Rule 12(b) briefing. (Appx93-94). | Satisfied. IPR2022-01333, -01334, -01335 (Paper 17) (July 26, 2023) (Termination Due to Settlement After Institution of Trial). |
| (4) the institution of IPR or PGR proceedings creates a substantially higher probability of improper cancellation of the patent than adjudication of the same claims through other proceedings, such as district court litigation. | Satisfied through statistical showing. (Opening Br. 18-25). | Satisfied through statistical showing. (Opening Br. 18-25). |

Terves as well (discussed above in Section I.A) also meets these four factors, though factor (3) above did not trigger until after the date of the district court's dismissal judgment (*i.e.*, the Terves IPR institution decision post-dated judgment in this case by about a month). And more to the point, Appellants did not need to name individuals in the first place, thus lending full effect to generalized allegations that Appellants have membership fitting all of the district court's factors (1) through (4).[6]

Therefore, despite no legal requirement to name specific members with Article III standing at the pleading stage, Appellants did. The USPTO would have this Court believe that Appellants chose to expend resources litigating an APA case against it in federal court without having any membership injured by the state of affairs that Appellants are trying to change. No legal authority permits this Court to accept this bizarre and demonstrably false point of view.

### D. Appellants' Statistics Carry Weight and Demonstrate Standing

Under *Apple v. Vidal*, Appellants possessed no burden to make any statistical showing to prove Article III standing because Apple needed no statistical showing.

---

[6] The USPTO attempts to inject a fifth factor beyond those of the district court: that "any cancellation would have to survive judicial review by this Court," where a difference in probabilities persists even after such review. (USPTO Br. 28, 31-32). As *Apple v. Vidal* shows, this factor has no impact on the concrete injury analysis. This Court presupposes that each forum (both the USPTO and the district court) acts correctly in a given case under the legal standards it is required to enforce, yet differences in validity outcomes still emerge. *Apple v. Vidal*, 63 F.4th at 17 (noting "burden of persuasion" differences among fora by themselves create Apple's "substantial risk" leading to "injury in fact").

63 F.4th at 17. For Apple, it was enough alone to rely on the "lighter burden of persuasion to prevail in challenging a patent claim than the burden applicable in district court." *Id.* Likewise here, Appellants represent the other side of that coin. Under this Court's own logic, it should have been enough, alone, that a *heavier* burden of persuasion faces challengers in district court invalidity disputes. Appellants and their members therefore benefit from rules that shunt validity disputes into any non-USPTO forum.

Even if the district court were correct that Appellants needed to make a statistical showing, the record demonstrates that Appellants overwhelmingly succeeded. On the final part of the district court test (statistics), the USPTO first contends that this subject is one of speculative inquiry, since it is supposedly not possible for a litigant to prove in advance that the judicial system will lead to any particular outcome in a given case. (USPTO Br. 31, quoting *Clapper*). As mentioned, this lack of clairvoyance did not trouble this Court in *Apple v. Vidal*. There, this Court did not require such proof in advance, as relative differences in burdens of persuasion were enough. *Apple v. Vidal*, 63 F.4th at 16-17.

In addition, the district court's own test called out a need for such statistics, demanding a showing of relative probabilities. Despite the USPTO's argument, it was not irrational for the district court to wish to see those statistics, since inquiry into relative probabilities of conflicting invalidity outcomes gives insight into patent

property damage under comparative regimes. It is not speculation, but common sense, that patents (and the companies who own them) are more intact and valid in a legal regime that invalidates patents less frequently. Such inquiries about present relative valuation do not require anyone to speculate about any single litigation outcome, nor about any risk of future harm.

Later and inconsistently in its brief, the USPTO accepts that relative statistics bear on the standing question, but attempts to brush aside Appellants' specific showing. (USPTO Br. 38-39, calling Appellants "wrong to assert that the district court was required to accept plaintiffs' standing-related statistics at face value"). In fact, the USPTO's authority backfires for it. The USPTO cites only one supporting authority: *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 917-18 (D.C. Cir. 2015) ("*FWW*"). But *FWW* is distinguishable, and actually supports finding standing here. There, the D.C. Circuit accepted the pleaded statistics themselves as true. *Id.* Plaintiffs only faced problems because those statistics did not prove what they said they prove. They did not allow an inference that one form of poultry inspection method increased contamination risk compared to another. *Id.* ("some scenarios" generated certain statistics, but the same documents showed that "under most scenarios" those statistics would materially differ in ways showing no comparative increased risk).

Here in contrast to *FWW*, accepting Appellants' proffered statistics as true leads only to the precise increased risk of property impairment that supports standing. To recap, those pleaded statistics were: 84% of final PTAB outcomes lead to at least one invalid claim, versus 29% of final district court adjudications lead to at least one invalid claim. (Appx27, Complaint ¶ 5; *see also* Appx97-98 ¶ 27 (Malone Decl. cited as part of Complaint), Appx104 ¶ 14 (Sherman Decl. cited as part of Complaint)). In fact, *FWW*'s specific analysis proves Appellants' point—that present increased risk of future harm by government action (or inaction) is indeed a pathway for showing Article III injury and causation. Nor should such statistics surprise anyone, since this Court already noted sharp differences among fora in the invalidity-challenge burden of persuasion. *Apple v. Vidal*, 63 F.4th at 17.

Nor can *FWW* somehow conflict with Appellants' controlling "increased risk" caselaw (that the USPTO ignores). That caselaw shows that courts must credit pleading allegations of present property impairment through increased future risk. Namely, Appellants cited *NRDC v. Wheeler*, 955 F.3d 68, 77 (D.C. Cir. 2020), as authority that "increased risk to property absent particular agency regulations suffices under Article III." (Opening Br. 19).

The USPTO ignores *Wheeler*, but *Wheeler* fully vindicates Appellants' argument. *Id.* (finding the "standing analysis falls readily into place" where "the 2018 Rule will lead to an increase in HFC emissions, which will in turn lead to an

increase in climate change, which will threaten petitioner's coastal property."). If anything, the chain of causation to injury is even stronger for Appellants than it was in *Wheeler*. Here, the veto power within the petition for rulemaking changes the 84% property-killing risk to 0%, whereas *Wheeler*'s rule-based increase in HFC emissions creates much more intangible (and difficult to measure) knock-on effects that lead ultimately to alleged coastal property damage.

The USPTO's brief does even worse than ignore *Wheeler* (which when followed, establishes standing here). Its brief also ignores, and certainly does not rehabilitate, the district court's fundamental and obvious mistake about how AIA trials work. As Appellants showed, the district court discounted Appellants' powerful comparative statistics because it believed erroneously that trial institution requires a "high likelihood" showing of invalidity from an AIA petitioner. (Opening Br. 17, 21, citing Appx15). In fact (as this Court and the USPTO know), the standard for IPR institution is "reasonable likelihood," whereas the standard for PGR institution is "more likely than not." 35 U.S.C. §§ 314(a), 324(a).

The district court fundamentally and strikingly erred. And such error was material and prejudicial. The district court's own words betray that, had it not held this obviously wrong impression about how AIA trials work, it would have correctly found Appellants' comparative statistics "shocking." (Appx15). They are indeed

"shocking"—so much so, that they give rise to Article III standing over the Section 553(e) rulemaking petition denial of the present case.

The USPTO's brief offers no explanation for the district court's obvious and irreconcilable "high likelihood" error. This misbelief distracted the district court from correctly finding the comparative statistics "shocking," and thus from finding Article III standing. Over this error, and the others named above and in the Opening Brief, this Court should reverse.

## II. THIS APPEAL IS NOT MOOT

Citing no decision where a new rulemaking notice "mooted" a request for judicial review of a denial of a rulemaking petition,[7] the USPTO argues that an April 2024 Notice of Proposed Rulemaking (NPRM) moots this entire appeal. (USPTO Br. 15-19). This appeal is not moot. Even the USPTO admits that the NPRM "proposed an approach different from the ones plaintiffs prefer" (USPTO Br. 19), insofar as the NPRM has no provision for anyone (much less small inventors) to veto institution of trial. The mootness argument is makeweight, and lacks merit.

---

[7] The USPTO cites an inapposite case where an NPRM mooted judicial review over an "unreasonable delay" claim which had asserted that the agency did not yet address a particular petition for rulemaking identical to that in the NPRM. (USPTO Br. 15, citing *In re International Union, United Mine Workers of Am.*, 231 F.3d 51, 54 (D.C. Cir 2000)). This case does not include an "unreasonable delay" claim, nor did the April 2024 NPRM commence rulemaking identical to what Appellants seek.

The recent NPRM has not provided Appellants the relief they seek. The Administrative Procedure Act establishes a person's right to petition for "issuance" of a rule. 5 U.S.C. § 553(e). Appellants' proposed rule, replete with its proposed "veto" power for small practicing inventors, is not currently on the table, nor remotely a part of current USPTO rulemaking efforts, much less already finalized. Imagine a petition for rulemaking to the National Transportation Safety Board where a citizen asks for a rule requiring all passenger cars to have four tires and a self-driving mode. The NTSB denies the petition, sparking judicial review, but then separately starts rulemaking limited to requiring four tires. That citizen did not receive the petitioned relief. Nothing is moot since the government interim action is not final, and it ignored the request to require a self-driving mode.

In making its mootness argument, the USPTO misapprehends Appellants' statements in the Complaint and in the Opening Brief. Those statements indicated that grant of the underlying petition would not have required the agency to promulgate the suggested text within Appellants' proposed rule. (USPTO Br. 17, citing Appx30, Opening Br. 9). In other words, any final rule might receive some edits, as long as the substance of the petitioned rule commences the notice and comment process. *See* 5 U.S.C. § 553(c) (requiring giving "interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments").

Appellants' statements rest comfortably within the context of how rulemaking works under the APA. The APA rulemaking process includes publication for notice and comment. As the Complaint itself notes in a paragraph left unquoted by the USPTO: "A grant of the Petition would not have predetermined the content of final rules, since the content of final rules would have been determined through the APA process of receiving comments, to which the agency could then have responded with textual adjustments in a final rule or rules." (Appx44-45, ¶ 57).

Expecting "textual adjustments" after publication for notice and comment of *Appellants'* proposed rule does not equate with the USPTO's wholesale omission of that proposed rule's veto power from the current NPRM. The NPRM package delivered in April 2024 for public input lacks (by the USPTO's own admission) the exact rule that Appellants earnestly seek, and which forms the gravamen of this entire case from inception. The USPTO's recent actions did not, in effect, grant (nor overturn the denial of) the current Section 553(e) petition on appeal, which was for the "issuance" of a particular rule—the small inventor IPR/PGR-veto rule.

Finally, Appellants' prayer for relief proves non-mootness. It requests a district court remand to order the USPTO to conclude the proceeding before it, and do so in a non-arbitrary and non-capricious way—which may only happen through grant of the petition and publication under Section 553(c) of Appellants' proposed "veto" rule. (Appx46). Appellants also prayed for "[a]ll other relief to which the

Plaintiffs may show themselves to be entitled" (Appx47), which naturally (as the foregoing arguments, those in the Opening Brief, and the allegations of the Complaint fully show) includes grant of the "veto" rule petition so that this rule may be published for notice and comment under Section 553(c). At minimum, the district court (not this Court in the first instance) should be the first to review and analyze mootness.

## III. CONCLUSION

For the foregoing reasons and those in the Opening Brief, this Court should reverse and remand for further proceedings.

Dated: July 9, 2024

Respectfully submitted,

*/s/ Robert Greenspoon*

ROBERT GREENSPOON
JONATHAN HILL
DUNLAP BENNETT & LUDWIG PLLC
333 North Michigan Avenue,
Suite 2700
Chicago, Illinois 60601
(312) 551-9500
rgreenspoon@dbllawyers.com
jhill@dbllawyers.com

Counsel for Appellants

FORM 19. Certificate of Compliance with Type-Volume Limitations

Form 19
July 2020

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:** 24-1396

**Short Case Caption:** US Inventor, Inc., et al. v. United States Patent and Trademark Office, et al.

**Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

- ☑ the filing has been prepared using a proportionally-spaced typeface and includes 5,016 words.
- ☐ the filing has been prepared using a monospaced typeface and includes ________ lines of text.
- ☐ the filing contains ________ pages / ________ words / ________ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. ________).

Date: 07/09/2024

Signature: /s/ Robert Greenspoon

Name: /s/ Robert Greenspoon

Save for Filing